115 T.C. No. 5

UNITED STATES TAX COURT

NEONATOLOGY ASSOCIATES, P.A., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1201-97, 1208-97,             Filed July 31, 2000.
            2795-97, 2981-97,
            2985-97, 2994-97,
            2995-97, 4572-97.

        Certain insurance salesmen formed two purported
voluntary employees' beneficiary associations (VEBA's)
to generate commissions on their sales of life and
other insurance products purchased through the VEBA's.
Each employer/participant contributed to its own plan
formed under the VEBA's, and each plan generally
provided that a covered employee would receive current-

_____

        [1] Cases of the following petitioners are consolidated
herewith: John J. and Ophelia J. Mall, docket No. 1208-97; Estate
of Steven Sobo, Deceased, Bonnie Sobo, Executrix, and Bonnie
Sobo, docket No. 2795-97; Akhilesh S. and Dipti A. Desai, docket
No. 2981-97; Kevin T. and Cheryl McManus, docket No. 2985-97;
Arthur and Lois M. Hirshkowitz, docket No. 2994-97; Lakewood
Radiology, P.A., docket No. 2995-97; and Wan B. and Cecilia T.
Lo, docket No. 4572-97.

year (term) life insurance on his or her life. Premiums on the underlying insurance policies were substantially greater than the cost of term life insurance because they funded both the cost of term life insurance and credits which would be applied to conversion universal life policies of the individual insureds. The credits applied to a conversion policy were "earned" on that policy evenly over 120 months, meaning that policyholders generally could withdraw any earned amount or borrow against it with no out-of-pocket expense.

Held: The corporate employer/participants (N and L) may not deduct contributions to their plans in excess of the cost of term life insurance.

Held, further, L may deduct payments made outside its plan for life insurance on two of its employees to the extent the payments funded term life insurance.

Held, further, neither M, a sole proprietorship/participant, nor N may deduct contributions to its plan to purchase life insurance for certain nonemployees.

Held, further, sec. 264(a)(1), I.R.C., precludes M from deducting contributions to its plan to purchase life insurance for its two employees.

Held, further, in the case of N and L, the disallowed deductions are constructive dividends to their employee/owners.

Held, further, Ps are liable for the accuracy-related penalties for negligence or intentional disregard of rules or regulations determined by R under sec. 6662(a), I.R.C.; L also is liable for the addition to tax for failure to file timely determined by R under sec. 6651(a), I.R.C.

Held, further, no P is liable for a penalty under sec. 6673(a)(1)(B), I.R.C.

Neil L. Prupis, Kevin L. Smith, and Theresa Borzelli, for petitioners.

Randall P. Andreozzi, Peter J. Gavagan, Mark A. Ericson, and Matthew I. Root, for respondent.

LARO, Judge:  The docketed cases, consolidated for purposes of trial, briefing, and opinion, represent three test cases selected by the parties to resolve their disagreements as to certain voluntary employees' beneficiary association (VEBA) plans; namely, the Southern California Medical Profession Association VEBA (SC VEBA) and the New Jersey Medical Profession Association VEBA (NJ VEBA).[2]  The parties in 19 other cases pending before the Court have agreed to be bound by the decisions we render herein as to these VEBA issues.

Two of the test cases involve a corporate employer and one or more employee/owners.  These employer/employee groups are the Neonatology Associates, P.A (Neonatology), group and the Lakewood Radiology, P.A. (Lakewood), group.  These groups relate to two purported welfare benefit funds formed under the SC VEBA; namely, the Neonatology Employee Welfare Plan (Neonatology Plan) and the Lakewood Employee Welfare Plan (Lakewood Plan).[3]

The third test case involves an individual working as a sole proprietor and two of his employees.  This group is the Wan B. Lo, Ph.D., D.O., d.b.a. Marlton Pain Control and Acupuncture

---

[2] We use the terms "VEBA" and "plan" for convenience and do not suggest that any or all of the subject arrangements are either bona fide plans for Federal income tax purposes or VEBA's under sec. 501(c)(9).

[3] Petitioners argue that these plans are welfare benefit funds within the meaning of sec. 419(e).  Respondent argues to the contrary.  We do not decide this issue.

Center (Marlton) group. The Marlton group relates to the Marlton Employee Welfare Plan (Marlton Plan), a purported welfare benefit fund formed under the NJ VEBA.[4]

In regard to each test case, respondent determined that the employer or sole proprietor could not deduct its or his contributions to the respective plan and, in the case of Neonatology and Lakewood, that the employee/owners had income to the extent that he or she benefited from a contribution.[5] Respondent determined that each petitioner was liable for deficiencies in Federal income tax as a result of the VEBA determinations and that each petitioner was liable for a related accuracy-related penalty under section 6662(a) for negligence or intentional disregard of rules or regulations. In the case of Lakewood, respondent also determined that it was liable for a 15-percent addition to tax under section 6651(a) for failure to file timely its 1992 Federal income tax return and a section 6621 increased rate of interest on its 1991 deficiency as to interest accruing after July 20, 1995.

Each petitioner petitioned the Court to redetermine respondent's determinations. Respondent's notices of deficiency

---

[4] We do not decide whether this plan is a welfare benefit fund under sec. 419(e).

[5] Respondent also made certain other adjustments of income and expense. Petitioners concede these adjustments, unless they are mathematical computations relating to the VEBA issues.

list the following deficiencies, addition to tax, and accuracy-related penalties:[6]

### Neonatology Group

Neonatology, docket No. 1201-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------------------|----------------------------------|
| 1992 | $1,620 | — | $324 |
| 1993 | 6,262 | — | 1,252 |

John J. and Ophelia J. Mall, docket No. 1208-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------------------|----------------------------------|
| 1992 | $6,186 | — | $1,237 |
| 1993 | 7,404 | — | 1,481 |

### Lakewood Group

Lakewood, docket No. 2995-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------------------|----------------------------------|
| 1991 | $169,437 | — | $33,887 |
| 1991 | — | — | — |
| 1992 | 71,110 | $10,667 | 14,222 |
| 1993 | 93,111 | — | 18,622 |

Estate of Steven Sobo, Deceased, Bonnie Sobo, Executrix, and Bonnie Sobo, docket No. 2795-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------------------|----------------------------------|
| 1991 | $27,729 | — | $5,546 |
| 1992 | 5,107 | — | 1,021 |
| 1993 | 3,018 | — | 604 |

---

[6] All years refer to the calendar year, except that, in the case of Lakewood, the first 1991 year is a fiscal year ended on Oct. 31, 1991, and the second 1991 year is a short taxable year ended on Dec. 31, 1991.

Akhilesh S. and Dipti A. Desai, docket No. 2981-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------|-------------------|
| 1991 | $42,047 | — | $8,409 |
| 1992 | 15,751 | — | 3,150 |
| 1993 | 25,016 | — | 5,003 |

Kevin T. and Cheryl McManus, docket No. 2985-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------|-------------------|
| 1991 | $6,821 | — | $1,364 |
| 1992 | 6,146 | — | 1,229 |
| 1993 | 8,214 | — | 1,643 |

Arthur and Lois M. Hirshkowitz, docket No. 2994-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------|-------------------|
| 1991 | $82,933 | — | $16,587 |
| 1992 | 45,233 | — | 9,047 |
| 1993 | 79,853 | — | 15,971 |

### Marlton Group

Wan B. and Cecilia T. Lo, docket No. 4572-97

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------|-------------------|
| 1993 | $41,807 | — | $8,361 |
| 1994 | 49,970 | — | 9,994 |

We decide the following issues:

1. Whether Neonatology and Lakewood may deduct contributions to their respective plans in excess of the amounts needed to purchase current-year (term) life insurance for their covered employees. We hold they may not.

2. Whether Lakewood may deduct payments made outside of its plan to purchase additional life insurance for two of its

employees.  We hold it may to the extent that the payments funded term life insurance.

3.  Whether Neonatology may deduct contributions made to its plan to purchase life insurance for John Mall (Mr. Mall), who was neither a Neonatology employee nor a person eligible to participate in the Neonatology Plan.  We hold it may not.

4.  Whether Marlton may deduct contributions to its plan to purchase insurance for its sole proprietor, Dr. Lo, who was neither a Marlton employee nor a person eligible to participate in the Marlton Plan.  We hold it may not.

5.  Whether section 264(a) precludes Marlton from deducting contributions to its plan to purchase term life insurance for its two employees.  We hold it does.

6.  Whether, in the case of Lakewood and Neonatology, the disallowed contributions/payments are includable in the employee/owners' gross income.[7]  We hold they are.

7.  Whether petitioners are liable for the accuracy-related penalties for negligence or intentional disregard of rules or regulations determined by respondent under section 6662(a).  We hold they are.

---

[7] Petitioners concede that the contributions are includable in the employees' gross income to the extent that they provided current-year life insurance protection.

8.  Whether Lakewood is liable for the addition to tax for failure to file timely determined by respondent under section 6651(a).  We hold it is.

9.  Whether we should grant respondent's motion to impose a $25,000 penalty against each petitioner under section 6673(a)(1)(B).  We hold we shall not.

Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the dollar.

## FINDINGS OF FACT

### I.  Overview of Petitioners

Neonatology is a professional medical corporation wholly owned by Ophelia J. Mall, M.D. (Dr. Mall).  Its principal place of business was in New Jersey when we filed its petition.  Dr. Mall and her husband, Mr. Mall (collectively, the Malls), resided in New Jersey when we filed their petition.

Neonatology reports its income and expenses for Federal income tax purposes using the cash receipts and disbursements method and the calendar year.  It reported the following relevant amounts on its 1992 and 1993 Federal corporate income tax returns:

|                                  | 1992      | 1993      |
|----------------------------------|-----------|-----------|
| Total income                     | $282,104  | $213,092  |
| Officer compensation             | 250,000   | 168,000   |
| Salaries & wages                 | -0-       | -0-       |
| Pension, profit-sharing, plans   | -0-       | -0-       |
| Employee benefit programs        | 26,000    | 28,623    |
| Taxable income (loss)            | (18,881)  | (20,958)  |
| Income tax                       | -0-       | -0-       |
| Alt. minimum tax                 | -0-       | -0-       |

Lakewood is a professional medical corporation owned equally by Arthur Hirshkowitz (Dr. Hirshkowitz), Akhilesh Desai (Dr. Desai), Kevin T. McManus (Dr. McManus), and Steven Sobo (Dr. Sobo), until his death on September 23, 1993, and by Vijay Sankhla (Dr. Sankhla) afterwards. When we filed the petitions of the various members of the Lakewood group,[8] Lakewood's principal place of business and the residence of each individual (and his or her spouse) was in New Jersey.

Lakewood reports its income and expenses for Federal income tax purposes using the cash receipts and disbursements method and, but for 1991, using the calendar year; its 1991 taxable years consist of a fiscal year ended on October 31, 1991, and a short taxable year ended on December 31, 1991. It reported the following relevant amounts on its Federal corporate income tax returns for the subject years:

_____

[8] The members of the Lakewood group are Lakewood, Drs. Hirshkowitz, Desai, and McManus, and the Estate of Steven Sobo, Deceased.

|                                     | 10/1991 | 12/1991 | 1992 | 1993 (As amended) |
|-------------------------------------|---------|---------|------|-------------------|
| Total income                        | $2,303,425 | $403,869 | $2,411,265 | $2,286,460 |
| Officers' compensation              | 987,554 | 350,000 | 1,171,931 | 940,895 |
| Salaries & wages                    | 148,750 | 29,167 | 200,565 | 303,750 |
| Pension, profit-sharing, plans      | 46,907 | 25,000 | 132,428 | 169,170 |
| Employee benefit programs           | -0- | -0- | -0- | -0- |
| Other deductions (VEBA contribution)| 480,901 | -0- | 209,869 | 296,056 |
| Taxable income (loss)               | 3,664 | (103,857) | (23,325) | (7,796) |
| Income tax                          | 1,246 | -0- | -0- | -0- |
| Alt. minimum tax                    | -0- | -0- | -0- | 20,531 |

It filed its 1992 Federal corporate income tax return untimely on May 28, 1993.

Marlton is a sole proprietorship owned by Wan B. Lo (Dr. Lo), and he reports Marlton's income and expenses on his personal Schedule C, Profit or Loss from Sole-Proprietor Business, using the cash receipts and disbursements method and the calendar year. Dr. Lo reported the following amounts for Marlton on Schedules C of his joint 1993 and 1994 Federal individual income tax returns:

|                                | 1993 | 1994 |
|--------------------------------|------|------|
| Gross income                   | $875,477 | $868,275 |
| Wages                          | 130,944 | 124,939 |
| Pension, profit-sharing, plans | 16,920 | 17,396 |
| Employee benefit programs      | 100,000 | 120,000 |
| Net profit                     | 406,863 | 381,122 |

Dr. Lo and his wife, Cecilia (Ms. Lo) (collectively, the Los), resided in New Jersey when we filed their petition.

## II. The Subject VEBA's

Pacific Executive Services (PES) was a California partnership formed by two insurancemen named Stephen R. Ross (Mr.

Ross) and Donald S. Murphy (Mr. Murphy).[9]  PES devised the idea of using a speciously designed life insurance product in the setting of deviously designed VEBA's to prosper financially from the enactment of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2085.  PES believed that the TRA restricted the ability of closely held businesses to reduce their tax liabilities through contributions to retirement and employee benefit plans.  PES believed that the TRA gave PES the opportunity to market aggressively to owners of such businesses a novel tax avoidance scheme.  PES anticipated that few of the prospective investors in the scheme would be interested in purchasing life insurance, the subject matter of the scheme, but that these persons would purchase the life insurance (C-group term) product described below in order to get the advertised benefits.

PES united with Barry Cohen (Mr. Cohen), a longtime insurance salesman, to market the subject VEBA's to medical professionals primarily through the Kirwan Cos. (Kirwan).  Mr. Cohen is an officer, director, and part owner of Kirwan.  He is not an attorney or an accountant.  Michael J. Kirwan (Mr. Kirwan)

---

[9] PES dissolved on or about Nov. 11, 1992, and Messrs. Ross and Murphy each formed a sole proprietorship under the respective names of Sea Nine Associates and DSM inc.  Sea Nine Associates and DSM inc. divided up the participants in the VEBA's.  For simplicity, subsequent references to PES may include Sea Nine Associates and DSM inc.

is Kirwan's president and other part owner.  Mr. Kirwan is not an attorney or an accountant.

Kirwan represented to prospective investors during its marketing of one or both of the subject VEBA's that the VEBA's let an investor make unlimited tax-deductible contributions to his or her separate plan and that each plan would give a covered employee significant paid-up life insurance when he or she left the plan.[10]  PES represented to prospective investors that each of the subject VEBA's gave investors

> the ability to park funds for several years while the funds continue to grow at interest in a tax free environment.  While most people would be happy to take accumulated funds, pay the tax due at that time at ordinary rates, [sic] we have created a plan which provides for a permanent deferral of all the taxes due, either during ones [sic] lifetime or to the heirs.  In summary, we create a tax deduction for the contributions to the * * * [VEBA] going in and a permanent tax deferral coming out.

> *      *      *      *      *      *      *

> Each individual employer establishes his own level of benefits and has his own trust account with a third party trustee * * *.  The contribution goes into the individual trust account for each employer and the benefits provided under the plan are paid for out of the individual accounts.  Each employer receives reports which apply only to his account.

The SC VEBA and the NJ VEBA were formed by the Southern California Medical Profession Association and the New Jersey

---

[10] We use the term "paid-up" in this context to mean that the insured did not have to make any additional premium payments on the underlying policy.

Medical Profession Association, respectively. PES established, manages, and controls both of these associations, neither of which is a valid or operating professional association. PES established both associations for the sole purpose of forming the subject VEBA's and of furthering its VEBA scheme by misleading targeted investor/medical professionals into believing that respectable, established medical associations were sponsoring an investment in the VEBA's. PES named the VEBA's after the medical profession to attempt further to legitimize its sale of the advertised tax benefits with the targeted investors. PES paid an established medical society, the Medical Society of New Jersey, a voluntary society of physicians and surgeons operating in the State of New Jersey, approximately $25,000 to endorse the SC VEBA as a final attempt to legitimize its scheme. PES represented to the Medical Society of New Jersey that the SC VEBA provided medical professionals with tax-deductible payments for high policy limits of life insurance and the potential to convert some or all of those payments into annuities or cash value life insurance which would allow the policyholders ultimately to withdraw that cash value tax free.

The subject VEBA's are structured so that each participating employer establishes its own plan thereunder, executes its own plan document, and has a plan name that bears its own name. Each employer, with the aid of an insurance salesman (primarily Mr.

Cohen), selects its plan administrator, the members of the committee administering its plan, and the level of benefits offered under its plan;[11] the only employee benefit provided under the subject VEBA's is a current-year death benefit payable at a specified multiple of prior-year compensation. Each employer generally funds its plan with a limited number of group insurance policies and/or group annuities owned by its plan for the benefit of its employees. All group life insurance policies must provide explicitly that the insured individual may convert his or her policy, without medical examination, to an individual policy upon termination of eligibility for coverage.

Each employer has its own trust account maintained under its plan for its covered employees, and each plan is accounted for separately. A covered employee has no recourse for benefits other than, first, from insurance contracts on his or her life and, second, from any assets held in the employer's plan. Employees covered by one plan cannot reach assets of another plan, and occurrences in one plan do not affect another plan's operation. Each plan prepares its own separate summary plan description, each employer may amend its plan at any time, and each employer may terminate its plan at any time by delivering

_____

[11] The committee members of the Neonatology Plan and the Lakewood Plan are Messrs. Murphy, Cohen, and Kirwan, and the committee members of the Marlton Plan are Mr. Ross, Daniel Sonnelitter, and Timothy S. Lo. PES administered all three plans at all times relevant herein.

written notice of termination to the trustee.  When an employer terminates its plan, assets remaining in that plan are distributed to the employer's covered employees in proportion to their compensation.

Independent entities serve as trustees of the respective trusts underlying the subject VEBA's, and each trust's terms are the same except for the sponsor's name.  Under the trusts' terms, each participating employer agrees to make the contributions required by the administrator to provide benefits under the plan, and neither the participating employer nor another employer is liable for a participating employer's contributions.  Any benefits payable under one plan are paid solely from that plan's allocable share of the trust fund, and neither the participating employer, administrator, nor trustee is liable for the inadequacy of funds required to be paid.  Each plan and corresponding trust account benefit exclusively the related employer's covered employees and their beneficiaries, and no part of that trust account may be used for, or diverted to, purposes other than the exclusive benefit of those employees.

III. <u>The Insurance Companies</u>

The Inter-American Insurance Co. of Illinois (Inter-American) specializes in providing to small, closely held corporations products such as qualified pension and profit sharing plans and group life insurance plans.  When Inter-

American was formed in the late 1970's, it was owned indirectly by Beaven/Inter-American Cos., Inc. (Beaven/Inter-American), the wholly owned company of Raymond G. Ankner (Mr. Ankner), who has worked in the insurance industry for more than 30 years. Inter-American liquidated on December 23, 1991, pursuant to a court order to do so, and Beaven/Inter-American changed its name to Beaven Cos., Inc. Mr. Ankner currently markets the life insurance products described herein through a company of his called CJA & Associates.

Capital Holding Agency Group, Inc. (Capital Holding), underwrites life and health insurance, annuities, and other insurance products offered for sale through certain of its affiliated insurance companies; e.g., Commonwealth Life Insurance Co. (Commonwealth) and Peoples Security Life Insurance Co. (Peoples Security, sometimes referred collectively with Commonwealth as Commonwealth). Capital Holding changed its name to Providian Agency Group, Inc., in 1994, and 3 years later, AEGON NV acquired Providian Agency Group, Inc., Commonwealth, and Peoples Security. Commonwealth and Peoples Security merged with the Monumental Life Insurance Co. in 1998, and all three companies are currently part of the AEGON USA Insurance Group (AEGON USA).

IV.  The Life Insurance Products

Inter-American and Commonwealth both issue a virtually identical conventional group term life insurance product known as the millennium group 5 (MG-5) policy.  Premiums on an MG-5 policy are generally commensurate with the life insurance risk assumed by the issuing company and do not present policyholders with asset accumulation.  The MG-5 policies allow policyholders to convert their policies to 5-year level annual renewable term, universal or whole life products which do not have any accumulated value (or "conversion credits" as that term is described below).

Inter-American and Commonwealth both issue a second virtually identical innovative life insurance product known as the continuous group (C-group) product.  The C-group product is a novel product designed by Inter-American (and later adopted by Commonwealth) to masquerade as a policy that provides only term life insurance benefits in order to make the product marketable to targeted investors and to allow Inter-American to make life insurance purchases from it more attractive than purchases from its larger competitors.  The C-group product is actually a universal life product consisting of two related policies.  The first policy, the accumulation phase of the C-group product, is a group term life insurance policy known as the C-group term policy.  The second policy, the payout phase of the C-group

product, is an individual universal life insurance policy known as the C-group conversion universalife (UL) policy. The C-group conversion UL policy is referenced in the C-group term contract and the C-group conversion UL contract as a "special conversion policy".

The C-group term policy provides covered employees with a life insurance (death) benefit while they work and a cash value that they may access by converting the term policy to the C-group conversion UL policy. Commonwealth and Inter-American assumed that 95 percent of the C-group term policyholders would ultimately convert their policies to C-group conversion UL policies, and they priced both policies together as two components of a single policy. Premiums on the C-group term policy are paid annually, and these premiums are approximately four to six times greater than premiums for a conventional life insurance group term policy (e.g., the MG-5 policy); as discussed infra, premiums on the C-group term policy fund both preconversion death benefits and postconversion credits (conversion credits) anticipated to be applied to the C-group conversion UL policy. If a premium is not paid timely on the C-group term policy, the policy terminates; i.e., lapses. Upon its lapsing, an individual policyholder has a guaranteed right (i.e., without evidence of insurability) to convert his or her policy to an individual policy; e.g., the C-group conversion UL policy. A

covered employee converts from a C-group term policy to a C-group conversion UL policy merely by filing an application.

The C-group conversion UL policy was specially designed for employees converting from the C-group term policy to individual coverage, and, absent an additional expense, it is issued only to individuals who convert from the C-group term policy to individual coverage. An insured employee has the right to convert, generally without expense, from the C-group term policy to a C-group conversion policy with equal or less face value if group coverage ceases because (1) the employee ceases employment, (2) the employee leaves the class eligible for coverage, (3) the underlying contract terminates, (4) the underlying contract is amended to terminate or reduce the insurance of a class of insured employees, or (5) the underlying contract terminates as to an individual employer or plan.[12] Upon conversion, conversion credits are transferred from the C-group term policy to the C-group conversion UL policy in a total amount that would approximate the cash value that would have been present if a typical universal life policy had been purchased when the C-group term policy was first issued. Inter-American and Commonwealth

---

[12] As discussed below, many of the individual petitioners ultimately received a C-group conversion UL policy by converting a C-group term policy. Each of these conversions occurred although none of these five conditions was met. The parties to the C-group product expected and understood that a C-group term policy could be converted at any time at the election of the insured.

developed and used tables to reference the amount of conversion credits which would accumulate under the C-group term policy and be transferred to the C-group conversion UL policy upon conversion, and the table amounts were referenced in marketing materials provided to prospective customers; no C-group term policyholder who converted to a C-group conversion UL policy ever received anything less than the appropriate amount referenced in the tables. Upon conversion, the C-group conversion UL policy is generally fully funded, and C-group conversion UL policyholders need not pay additional premiums on the C-group conversion UL policy. A converting policyholder may, if he or she desires, pay additional premiums on the C-group conversion UL policy. None of the individual petitioners chose to do so.

Mr. Ankner designed the concept of conversion credits to allow the C-group term policy to operate in tandem with the C-group conversion UL policy, while preserving the appearance and argument that the two policies were separate and distinct. Conversion credits generally work as follows. With respect to each premium paid on the C-group term policy, the portion that exceeds the applicable mortality charge (cost of insurance) is set aside in a conversion credit account bearing interest at 4.5 percent per annum for transfer to the C-group conversion UL policy upon conversion thereto. Upon conversion, the conversion credits which have accumulated up to that time (conversion credit

balance) are generally transferred to the C-group conversion UL policy in accordance with a schedule under which (1) none of the conversion credit balance is transferred to the C-group conversion UL policy if conversion occurs in the C-group term policy's first year, (2) 47.5 percent of the conversion credit balance is transferred to the C-group conversion UL policy if conversion occurs in the C-group term policy's second year, (3) 90.25 percent of the conversion credit balance is transferred to the C-group conversion UL policy if conversion occurs in the C-group term policy's third year, and (4) 95 percent of the conversion credit balance is transferred to the C-group conversion UL policy if conversion occurs in the C-group term policy's fourth or later year.[13]  Policyholders never receive more than 95 percent of their conversion credit balance because the insurance salesperson, upon conversion, is paid a commission equal to 5 percent of that balance.  Conversion credits transferred from the C-group term policy to the C-group conversion UL policy are applied to the cash value in the C-group conversion UL policy (i.e., they are earned by the policyholder and made available to him or her) in 120 monthly installments,

_____

[13] For C-group term policies issued after Jan. 31, 1993, 0 percent of the conversion credit balance is transferred to the C-group conversion UL policy if conversion occurs in the policy's first 4 years, and 95 percent of the conversion credit balance is transferred to the conversion policy if conversion occurs at any other time.

beginning with the month of conversion.[14]  C-group conversion UL policyholders may borrow against their policies up to the net loan value (i.e., cash value less any prior outstanding loans), and, after the fourth year, any loans are at the same interest rate as is credited to the conversion credit balance.

Statutory reserves are maintained for the C-group term policies in an amount that equals the greater of:  (1) The minimum statutory reserve for group term life insurance, which excludes consideration of the conversion benefits, or (2) the present value of expected future payments under the policies (including both death benefits and applied conversion credits) less the present value of expected future premiums.[15]  Present values are calculated using best-estimate assumptions as to interest, mortality, lapses, and expenses.  Inter-American and Commonwealth reinsured with a third party certain amounts of the risk associated with the C-group product.

The C-group term policy provides an annual experience refund to the policyholder.  Interest of 4.5 percent per annum is

---

[14] An insurance company usually imposes a surrender charge upon a policyholder who surrenders his or her policy before the insurance company recovers its costs as to that policy.  The C-group conversion UL policy was generally designed without surrender charges by treating portions of the conversion credit balance as earned and unearned, depending on the number of months that the policy was held.  A policyholder forfeits the unearned portion upon surrender of the policy.

[15] Statutory reserves were maintained separately for the C-group conversion UL policies.

credited to the conversion credit balance at or about the end of each certificate year, and, to the extent that the interest on the funds reflected in the balance actually exceeds the credited amount, the excess is returned to the policyholder as an experience refund. The experience refund is credited to the policyholder as a reduction of the next premium due on the policy.

V. The Neonatology Plan

Mr. Cohen introduced Dr. Mall to the SC VEBA, and she decided on her own, without seeking the advice of an independent knowledgeable professional, to cause Neonatology to invest therein. Dr. Mall knew that term life insurance was substantially more expensive to buy through the SC VEBA than through other plans offered to her by the American Medical Association and the American Academy of Pediatrics. She believed that the SC VEBA was the best investment for Neonatology because it offered her the proffered tax benefits and accumulated value. Dr. Mall received correspondence on the SC VEBA but generally chose not to read it before investing in the SC VEBA.

Neonatology established the Neonatology Plan under the SC VEBA on January 31, 1991, effective January 1, 1991, and the Malls were the only persons covered by that plan during the relevant years. Mr. Mall was not a paid employee of Neonatology, and he was not eligible to join the plan. Dr. Mall and PES, the

plan administrator, allowed Mr. Mall to join the plan, and they made him eligible to receive a death benefit in an amount commensurate with the death benefit payable under other life insurance that he had owned outside the plan. Dr. Mall falsified and backdated documents in an attempt to legitimize Mr. Mall's participation in the Neonatology Plan and to attempt to legitimize the plan with various governmental agencies and regulatory bodies.

The Neonatology Plan's adoption agreement provides that all employees covered by the plan will receive a death benefit equal to 6.5 times his or her prior-year "compensation" (defined by the plan to exclude nontaxable fringe benefit items). Neonatology paid Dr. Mall compensation of $240,000, $250,000, and $168,000 during 1991, 1992, and 1993, respectively. Neonatology did not pay Mr. Mall any compensation during those years.

Neonatology contributed to the Neonatology Plan during each year from 1991 through 1993 and, for each subject year, claimed a deduction for those contributions and other related amounts. In 1991, Neonatology contributed $10,000 to the plan on behalf of Dr. Mall. It also paid the plan's trustee and its administrator $1,000 each. In 1992, Neonatology contributed $10,000 to the plan on behalf of Dr. Mall and $10,000 on behalf of Mr. Mall. It deducted the $20,000 on its 1992 Federal corporate income tax return as an employee benefit program expense, and it deducted on

that return another $1,000 that was paid to PES for its administrator services. In 1993, Neonatology contributed $21,623 to the plan on behalf of Dr. Mall and $250 for a "VEBA set-up fee". It deducted those amounts on its 1993 Federal corporate income tax return as an employee benefit program expense, and it deducted on that return $750 that it contributed to the plan and $1,000 that it paid PES for its administrator services.

During the relevant years, the Neonatology Plan purchased three life insurance policies, two on the life of Dr. Mall and the third on the life of Mr. Mall.[16] The attributes of these policies are as follows.

### 1. Dr. Mall's Inter-American C-Group Term Policy

Effective March 15, 1991, Inter-American issued a $650,000 C-group term policy (certificate No. 5076202) on the life of Dr. Mall, age 45. The first-year premium was $9,906, and the cost of insuring Dr. Mall for that year was $1,689.85. The Neonatology Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $8,585.88 ($9,906 - $1,689.85 + $369.73); the $369.73 is the interest of 4.5 percent earned on the conversion credit balance (($8,585.88 - $369.73) x 4.5% = $369.73)). None of the conversion credit balance could have been

---

[16] The Neonatology Plan also purchased one annuity during those years. On or about Mar. 15, 1991, Inter-American issued to the Neonatology Plan a Plus II Group Annuity (#C15576/91079) for an initial premium of $69.

transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.  This policy lapsed on March 15, 1992.

### 2.  Dr. Mall's Commonwealth C-Group Term Policy

Effective March 15, 1992, Commonwealth issued a $650,000 C-group term policy (certificate No. 6007725) on the life of Dr. Mall, age 46.  The first-year premium was $10,653.50, and the cost of insuring Dr. Mall for that year was $1,764.60.  The Neonatology Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $9,288.90 ($10,653.50 - $1,764.60 + $400); the $400 is the interest of 4.5 percent earned on the conversion credit balance (($9,288.90 - $400) x 4.5% = $400)).  None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $10,731.50.  The policy was credited with an experience refund of $106.08, and the Neonatology Plan paid the net premium of $10,625.42 ($10,731.50 - $106.08).  The cost of insuring Dr. Mall for the second year was $1,814.34, and, at the end of that year, the conversion credit balance was $19,025.33 ($9,288.90 + $10,731.50 - $1,814.34 + $819.27); the $819.27 is the interest of 4.5 percent earned on the conversion credit balance (($19,025.33

- $819.27) x 4.5% = $819.27)).  Of the conversion credit balance, $9,037.03 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($19,025.33 x 47.5%).

The Neonatology Plan continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective October 15, 1996, Dr. Mall converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $71,102.  At the time of conversion, the C-group term policy's conversion credit balance was $46,508.32, and $44,182.90 of that amount ($46,508.32 x 95%) was transferred to the C-group conversion UL policy for potential earning.  Dr. Mall will earn these credits in 120 equal monthly installments, beginning October 1996.  The conversion credit balance of $46,508.32 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables:  (1) Business issued before February 1, 1993, (2) female, (3) issue age 46, (4) duration of 4 years 7 months, and (5) $650,000 death benefit.

### 3.  Mr. Mall's Commonwealth C-Group Term Policy

Effective March 15, 1992, Commonwealth issued a $500,000 C-group term policy (certificate No. 6010423) on the life of Mr. Mall, age 47.  The first-year premium was $10,290, and the cost of insuring Mr. Mall was $2,056.78.  The Neonatology Plan paid

the first-year premium, and, at the end of that year, the conversion credit balance was $8,603.71 ($10,290 - $2,056.78 + $370.49); the $370.49 is the interest of 4.5 percent earned on the conversion credit balance (($8,603.71 - $370.49) x 4.5% = $370.49)).  None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $10,530.  The policy was credited with an experience refund of $98.25, and the Neonatology Plan paid the net premium of $10,431.75 ($10,530 - $98.25).  The cost of insuring Mr. Mall for the second year was $2,250.45, and, at the end of that year, the conversion credit balance was $17,643.01 ($8,603.71 + $10,530 - $2,250.45 + $759.75); the $759.75 is the interest of 4.5 percent earned on the conversion credit balance (($17,643.01 - $759.75) x 4.5% = $759.75)).  Of the conversion credit balance, $8,380.43 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($17,643.01 x 47.5%).

The Neonatology Plan continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective October 15, 1996, Mr. Mall converted this policy to a fully paid, individually owned C-group conversion UL policy in

the face amount of $67,069.  At the time of conversion, the C-group term policy's conversion credit balance was $43,304, and $41,138.80 of that amount ($43,304 x 95%) was transferred to the C-group conversion UL policy for potential earning.  Mr. Mall will earn these credits in 120 equal monthly installments, beginning October 1996.  The conversion credits of $41,138.80 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables:  (1) Business issued before February 1, 1993, (2) male, (3) issue age 47, (4) duration of 4 years 7 months, and (5) $500,000 death benefit.

The Neonatology Plan paid no benefits during the relevant years, and the 1992 and 1993 Forms W-2, Wage and Tax Statements, that Neonatology issued to Dr. Mall did not report any life insurance benefits provided to her under the plan.  On their joint 1992 and 1993 Federal individual income tax returns, the Malls reported $1,626 and $3,654, respectively, as P.S. 58 income.[17]

---

[17] The term "P.S. 58" refers to the rates deemed by the Commissioner to be acceptable in determining the cost of life insurance protection includable in gross income for a participant covered by a life insurance contract held in a qualified pension plan.  See Rev. Rul. 55-747, 1955-2 C.B. 228; see also sec. 1.72-16, Income Tax Regs.; cf. sec. 1.79-3, Income Tax Regs. (rules generally used to determine the cost of group term life insurance provided to employee by employer).  See generally sec. 79(a)(1) (employee's gross income generally does not include the cost of the first $50,000 of group term life insurance on his or
(continued...)

During the subject years, Commonwealth paid the following commissions on the C-group products issued on the Malls' lives:

| Period Beginning | Kirwan | Mr. Ankner[1] | Mr. Murphy |
|---|---|---|---|
| 3/92 | $8,922.94 | $709.34 | $2,498.67 |
| 3/93 | 852.82 | 136.88 | 273.74 |

[1]These commissions were paid to Mr. Ankner either indirectly through one of his companies or directly.

Kirwan also received, in or about 1996, commissions equal to 5 percent of the conversion credit balances, both earned and unearned, which were applied to the Malls' C-group conversion UL policies. These commissions totaled $4,266.09 (($44,182.90 x 5%) + ($41,138.80 x 5%)).

Respondent determined that Neonatology could not deduct its excess contributions to the Neonatology Plan and increased Neonatology's income by $23,646 in 1992 and $19,969 in 1993 to reflect the following adjustments:

|  | 1992 | 1993 |
|---|---|---|
| Contributions to the Neonatology Plan | $20,000 | $22,623 |
| Administrator's fees | 1,000 | 1,000 |
| 1991 NOL from plan contributions | 4,272 | — |
| Subtotal | 25,272 | 23,623 |
| Less: P.S. 58 costs included in income | 1,626 | 3,654 |
| Adjustment | 23,646 | 19,969 |

Respondent determined primarily that the disallowed contributions were not deductible under section 162(a) because they did not

---

[17](...continued)
her life).

provide current-year life insurance protection.[18]  Respondent
determined alternatively that the excess contributions were not
deductible under section 404(a)(5); respondent determined that
the Neonatology Plan was not a "welfare benefit fund" under
section 419(e) but a nonqualified plan of deferred compensation
subject to the rules of section 404.  Respondent determined as a
second alternative that, assuming the Neonatology Plan is a
"welfare benefit fund", any deduction of the excess contributions
was precluded by section 419; for this alternative, respondent
determined that the SC VEBA was not a "10-or-more employer plan"
under section 419A(f)(6) as asserted by petitioners.

As to the Malls, respondent determined they had "other
income" of $19,374 in 1992 (Neonatology's adjustment of $23,646
less the 1991 NOL of $4,272) and $19,969 in 1993.  Respondent
determined that the other income was either constructive dividend
income under section 301 or nonqualified deferred compensation
under section 402(b).  As to the latter position, respondent
determined that Dr. Mall was taxable on the disallowed

---

[18] Although respondent's determination acknowledges that
Neonatology may deduct any contribution that is attributable to
current-year life insurance protection, respondent has not
determined as to the Neonatology group (or the Lakewood group as
discussed infra) the cost of that current-year protection.  As to
the Neonatology group, respondent's determination merely takes
into account the fact that the Malls recognized P.S. 58 income
for the subject years.  As mentioned supra note 17, P.S. 58
income relates to life insurance contracts held in a qualified
pension plan.

contributions when they were made, because she received in connection with services property not subject to a substantial risk of forfeiture under section 83.

## VI. The Lakewood Plan

Mr. Cohen introduced Drs. Hirshkowitz and Desai to the SC VEBA in 1990. Drs. Hirshkowitz and Desai both knew that the premiums paid on the C-group product were more expensive than the cost of term life insurance. They caused Lakewood to invest in the SC VEBA anyway because, as they understood it, the SC VEBA ultimately allowed Lakewood's principals to withdraw the excess premiums from the plan tax free by way of policy loans. All of Lakewood's principals are physicians, and Dr. Hirshkowitz, on the basis of his conversations with Mr. Cohen, understood that the SC VEBA allowed policyholders to convert their C-group term policies to individual policies which allowed the withdrawal of the cash value at no additional expense. Dr. Desai, on the basis of his conversations with Mr. Cohen, understood that premiums on the C-group product covered both term insurance and conversion credits, and, in his capacity as a member of Lakewood's board of directors, would have spoken against the SC VEBA had the conversion credits not been available. Drs. Hirshkowitz and Desai both relied on the word of Mr. Cohen as to the validity of the SC VEBA, seeking no independent competent professional advice

and neither requesting nor reading any of the literature on the plan.

Lakewood established the Lakewood Plan under the SC VEBA on December 28, 1990, effective January 1, 1990. The only employees covered by the plan during the subject years were Drs. Hirshkowitz, Desai, Sobo, McManus, and Sankhla.[19] During the respective years from 1990 through 1993, Lakewood paid Dr. Desai compensation of $318,020, $308,279, $297,452, and $275,270, it paid Dr. Sobo compensation of $330,030 $354,277, $329,185, and $203,640, it paid Dr. McManus compensation of $218,821, $368,708, $340,376, and $333,204, and it paid Dr. Sankhla compensation of $50,000, $127,500, $142,500, and $147,500. During the respective years from 1990 through 1992, Lakewood paid Dr. Hirshkowitz compensation of $327,691, $181,994, and $204,918.

Under the terms of the Lakewood Plan, as in effect through December 31, 1992, a covered employee received a death benefit equal to 2.5 times his or her prior-year compensation. Lakewood amended its plan as of January 1, 1993, effective January 1, 1990, to increase the death benefit to 8.15 times prior-year compensation. Drs. Hirshkowitz, Desai, and McManus each elected on January 1, 1993, not to accept this additional coverage.

---

[19] Drs. Bharat Patel and Chadru Jain were also employees of Lakewood. The record indicates that they joined the Lakewood Plan after the subject years.

No Lakewood employee covered by the Lakewood Plan, if he or she had died, would ever have received a death benefit equal to 2.5 times or 8.15 times his or her prior-year compensation. Each of Lakewood's employee/owners decided the amount that Lakewood would contribute to the SC VEBA on his or her behalf, and Lakewood wrote separate checks for each employee/owner's contribution, noting on the check the name of the person for whom the contribution was made.

On its Federal corporate income tax return for its taxable year ended October 31, 1991, Lakewood claimed a $480,901.49 deduction for VEBA contributions made to the Lakewood Plan for the following persons' benefits:

```
Trustee's fees........ $1,000.00
Dr. Hirshkowitz.......254,051.49
Dr. Desai.............122,750.00
Dr. Sobo.............. 83,100.00
Dr. McManus...........  20,000.00
                       480,901.49
```

On its 1992 Federal corporate income tax return, Lakewood claimed a $209,869.03 deduction for VEBA contributions made for the following persons' benefits:

```
Dr. Hirshkowitz......$136,678.43
Dr. Desai...........  42,056.44
Dr. Sobo............  13,213.52
Dr. McManus.........   17,920.64
                      209,869.03
```

This deduction consists of contributions to the Lakewood Plan and $70,000 that Lakewood paid directly to Peoples Security for C-group term policies purchased outside of the Lakewood Plan for

Drs. Hirshkowitz and Desai.  Of the $70,000 paid to Peoples

Security, $50,000 was attributable to the coverage of Dr.

Hirshkowitz, and $20,000 was attributable to the coverage of Dr.

Desai.

On its 1993 Federal corporate income tax return, Lakewood

claimed a $296,055.90 deduction for VEBA contributions made for

the following persons' benefits:

```
Trustee's fees........ $1,000.00
Dr. Hirshkowitz.......211,119.90
Dr. Desai............. 55,000.00
Dr. Sobo.............. [1]5,000.00
Dr. Sankhla...........  5,750.00
Dr. McManus........... 18,186.00
                      296,055.90
```

[1]The Lakewood Plan returned this $5,000 to Lakewood in
October 1993.

This deduction consists of contributions to the Lakewood Plan and

$82,926.23 that Lakewood paid directly to Peoples Security for C-

group term policies purchased outside of the Lakewood Plan for

Drs. Hirshkowitz, Sankhla, and Desai.  Of the $82,926.23 paid to

Peoples Security, $57,168.80 was attributable to the coverage of

Dr. Hirshkowitz, $5,750 was attributable to the coverage of Dr.

Sankhla, and $20,007.43 was attributable to the coverage of Dr.

Desai.

During the relevant years, the Lakewood Plan purchased 12

insurance policies on the lives of Lakewood's principals.  The

attributes of these policies are as follows.

## 1. Dr. Hirshkowitz' Inter-American C-Group Term Policy

Effective December 31, 1990, Inter-American issued a $1 million C-group term policy (certificate No. 5076058) on the life of Dr. Hirshkowitz, age 57. The first-year premium was $48,680, and the cost of insuring Dr. Hirshkowitz for that year was $9,475.15. The Lakewood Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $40,969.07 ($48,680 - $9,475.15 + $1,764.22); the $1,764.22 is the interest of 4.5 percent earned on the conversion credit balance (($40,969.07 - $1,764.22) x 4.5% = $1,764.22)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year. This policy lapsed on December 31, 1991.

## 2. Dr. Desai's Inter-American C-Group Term Policy

Effective December 31, 1990, Inter-American issued a $1 million C-group term policy (certificate No. 5076059) on the life of Dr. Desai, age 45. The first-year premium was $17,390, and the cost of insuring Dr. Desai for that year was $3,419.48. The Lakewood Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $14,599.19 ($17,390 - $3,419.48 + $628.67); the $628.67 is the interest of 4.5 percent earned on the conversion credit balance (($14,599.19 - $628.67) x 4.5% = $628.67)). None of the conversion credit

balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.  This policy lapsed on December 31, 1991.

### 3.  Dr. Sobo's Inter-American C-Group Term Policy

Effective December 31, 1990, Inter-American issued a $1 million C-group term policy (certificate No. 5076057) on the life of Dr. Sobo, age 38.  The first-year premium was $10,800, and the cost of insuring Dr. Sobo for that year was $2,374.08.  The Lakewood Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $8,805.09 ($10,800 - $2,374.08 + $379.17); the $379.17 is the interest of 4.5 percent earned on the conversion credit balance (($8,805.09 - $379.17) x 4.5% = $379.17)).  None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.  This policy lapsed on December 31, 1991.

### 4.  Dr. Hirshkowitz' Commonwealth C-Group Term Policy

Effective October 31, 1991, Commonwealth issued a $150,000 C-group term policy (certificate No. 6000972) on the life of Dr. Hirshkowitz, age 58.  The first-year premium was $7,540.50, and the cost of insuring Dr. Hirshkowitz for that year was $1,572.75. The Lakewood Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $6,236.30 ($7,540.50

- $1,572.75 + $268.55); the $268.55 is the interest of 4.5 percent earned on the conversion credit balance (($6,236.30 - $268.55) x 4.5% = $268.55)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $7,720. The policy was credited with an experience refund of $115.21, and the Lakewood Plan paid the net premium of $7,604.79 ($7,720 - $115.21). The cost of insuring Dr. Hirshkowitz for the second year was $1,665.17, and, at the end of that year, the conversion credit balance was $12,844.23 ($6,236.30 + $7,720 - $1,665.17 + $553.10); the $553.10 is the interest of 4.5 percent earned on the conversion credit balance (($12,844.23 - $553.10) x 4.5% = $553.10)). Of the conversion credit balance, $6,101.01 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($12,844.23 x 47.5%).

The third-year premium, before any experience refund, was $7,972.50. The policy was credited with an experience refund of $176.01, and the Lakewood Plan paid the net premium of $7,796.49 ($7,972.50 - $176.01). The cost of insuring Dr. Hirshkowitz for the third year was $1,798.22, and, at the end of that year, the conversion credit balance was $19,874.34 ($12,844.23 + $7,972.50

- $1,798.22 + $855.83); the $855.86 is the interest of 4.5 percent earned on the conversion credit balance (($19,874.34 - $855.83) x 4.5% = $855.83)).  Of the conversion credit balance, $17,935.59 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its third year ($19,874.34 x 90.25%).

The Lakewood Plan continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective October 31, 1996, Dr. Hirshkowitz converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $44,653.  At the time of conversion, the balance in the C-group term policy's conversion credit account was $35,400, and $33,630 of that amount ($35,400 x 95%) was transferred to the C-group conversion UL policy for potential earning.  Mr. Hirshkowitz will earn these credits in 120 equal monthly installments, beginning October 1996.  The conversion credit balance of $33,630 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables:  (1) Business issued before February 1, 1993, (2) male, (3) issue age 58, (4) duration of 5 years, and (5) $150,000 death benefit.

### 5. Dr. Desai's Commonwealth C-Group Term Policy

Effective October 31, 1991, Commonwealth issued a $150,000 C-group term policy (certificate No. 6000973) on the life of Dr. Desai, age 46. The first-year premium was $2,836.50, and the cost of insuring Dr. Desai for that year was $565.11. The Lakewood Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $2,373.60 ($2,836.50 - $565.11 + $102.21); the $102.21 is the interest of 4.5 percent earned on the conversion credit balance (($2,373.60 - $102.21) x 4.5% = $102.21)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $2,890.50. The policy was credited with an experience refund of $44.06, and the Lakewood Plan paid the net premium of $2,846.44 ($2,890.50 - $44.06). The cost of insuring Dr. Desai for the second year was $607.89, and, at the end of that year, the conversion credit balance was $4,865.74 ($2,373.60 + $2,890.50 - $607.89 + $209.53); the $209.53 is the interest of 4.5 percent earned on the conversion credit balance (($4,865.74 - $209.53) x 4.5% = $209.53)). Of the conversion credit balance, $2,311.23 could have been transferred at this time to the C-group

conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($4,865.74 x 47.5%).

The third-year premium, before any experience refund, was $2,962.50. The policy was credited with an experience refund of $66.69, and the Lakewood Plan paid the net premium of $2,895.81 ($2,962.50 - $66.69). The cost of insuring Dr. Desai for the third year was $665.36, and, at the end of that year, the conversion credit balance was $7,485.21 ($4,865.74 + $2,962.50 - $665.36 + $322.33); the $322.33 is the interest of 4.5 percent earned on the conversion credit balance (($7,485.21 - $322.33) x 4.5% = $322.33)). Of the conversion credit balance, $6,755.40 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its third year ($7,485.21 x 90.25%).

The Lakewood Plan continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective October 31, 1996, Dr. Desai converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $22,916. At the time of conversion, the C-group term policy's conversion credit balance was $13,143.16, and $12,486 of that amount ($13,143.16 x 95%) was transferred to the C-group conversion UL policy for potential earning. Dr. Desai will earn this amount in 120 equal monthly installments, beginning October 1996. The conversion credit balance of $12,486

equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables: (1) Business issued before February 1, 1993, (2) male, (3) issue age 46, (4) duration of 5 years, and (5) $150,000 death benefit.

### 6. Dr. Sobo's $150,000 Commonwealth C-Group Term Policy

Effective October 31, 1991, Commonwealth issued a $150,000 C-group term policy (certificate No. 6000971) on the life of Dr. Sobo, age 38. The first-year premium was $1,620, and the cost of insuring Dr. Sobo for that year was $356.11. The Lakewood Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $1,320.76 ($1,620 - $356.11 + $56.87); the $56.87 is the interest of 4.5 percent earned on the conversion credit balance (($1,320.76 - $56.87) x 4.5% = $56.87)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $1,638. The policy was credited with an experience refund of $24.48, and the Lakewood Plan paid the net premium of $1,613.52 ($1,638 - $24.48). The cost of insuring Dr. Sobo for the second year was $370.54.

Dr. Sobo died on September 23, 1993. On December 14, 1993, the Lakewood Plan paid $150,000 to Bonnie W. Sobo (Ms. Sobo) as the beneficiary of this policy.

### 7. Dr. McManus' Commonwealth C-Group Term Policy

Effective October 31, 1991, Commonwealth issued a $2.1 million C-group term policy (certificate No. 6001004) on the life of Dr. McManus, age 34. The first-year premium was $18,186, and the cost of insuring Dr. McManus for that year was $4,496.72. The Lakewood Plan paid the first-year premium, and, at the end of that year, the conversion credit balance was $14,305.30 ($18,186 - $4,496.72 + $616.02); the $616.02 is the interest of 4.5 percent earned on the conversion credit balance (($14,305.30 - $616.02) x 4.5% = $616.02)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $18,186. The policy was credited with an experience refund of $265.36, and the Lakewood Plan paid the net premium of $17,920.64 ($18,186 - $265.36). The cost of insuring Dr. McManus for the second year was $4,465.82, and, at the end of that year, the conversion credit balance was $29,286.63 ($14,305.30 + $18,186 - $4,465.82 + $1,261.15); the $1,261.15 is the interest of 4.5 percent earned on the conversion credit balance (($29,286.63 -

$1,261.15) x 4.5% = $1,261.15)).  Of the conversion credit balance, $13,911.15 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($29,286.63 x 47.5%).

The third-year premium, before any experience refund, was $18,186.  The policy was credited with an experience refund of $401.32, and the Lakewood Plan paid the net premium of $17,784.68 ($18,186 - $401.32).  The cost of insuring Dr. McManus for the third year was $4,433.46, and, at the end of that year, the conversion credit balance was $44,975.93 ($29,286.63 + $18,186 - $4,433.46 + $1,936.76); the $1,936.76 is the interest of 4.5 percent earned on the conversion credit balance (($44,975.93 - $1,936.76) x 4.5% = $1,936.76)).  Of the conversion credit balance, $40,590.78 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its third year ($44,975.93 x 90.25%).

The Lakewood Plan continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective October 1, 1996, Dr. McManus converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $187,827.  At the time of conversion, the C-group term policy's conversion credit balance was $78,672.63, and

$74,739 of that amount ($78,672.63 x 95%) was transferred to the C-group conversion UL policy for potential earning. Dr. McManus will earn these credits in 120 equal monthly installments, beginning October 1996. The conversion credit balance of $74,739 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables: (1) Business issued before February 1, 1993, (2) male, (3) issue age 34, (4) duration of 5 years, and (5) $2.1 million death benefit.

8. Dr. Hirshkowitz' Commonwealth C-Group Term Policy

Effective December 31, 1991, Commonwealth issued a $1 million C-group term policy (certificate No. 6004482) on the life of Dr. Hirshkowitz, age 58. The premium for the 10-month period from December 31, 1991, through October 30, 1992, was $41,891.67, and the cost of insuring Dr. Hirshkowitz for the 10-month period was $8,814.60. The Lakewood Plan paid the 10-month premium, and, at the end of that 10-month period, the conversion credit balance was $34,317.46 ($41,891.67 - $8,814.60 + $1,240.39); the $1,240.39 is the interest of 4.5 percent earned on the conversion credit balance (($34,317.46 - $1,240.39) x 4.5% x 10/12 = $1,240.39)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The premium for the next 12-month period, before any experience refund, was $51,470. The policy was credited with an experience refund of $200, and the Lakewood Plan paid the net premium of $51,270 ($51,470 - $200). The cost of insuring Dr. Hirshkowitz for the second year was $11,189.96, and, at the end of that year, the conversion credit balance was $77,954.39 ($34,317.46 + $51,470 - $11,189.96 + $3,356.89); the $3,356.89 is the interest of 4.5 percent earned on the conversion credit balance (($77,954.39 - $3,356.89) x 4.5% = $3,356.89)). Of the conversion credit balance, $37,028.34 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($77,954.39 x 47.5%).

The third-year premium for the next 12-month period, before any experience refund, was $53,150. The policy was credited with an experience refund of $1,321.18, and the Lakewood Plan paid the net premium of $51,828.82 ($53,150 - $1,321.18). The cost of insuring Dr. Hirshkowitz for the third year was $12,095.03, and, at the end of that year, the conversion credit balance was $124,364.78 ($77,954.39 + $53,150 - $12,095.03 + $5,355.42); the $5,355.42 is the interest of 4.5 percent earned on the conversion credit balance (($124,364.78 - $5,355.42) x 4.5% = $5,355.42)). Of the conversion credit balance, $112,239.22 could have been transferred at this time to the C-group conversion UL policy,

upon conversion thereto, because the C-group term policy was in its third year ($124,364.78 x 90.25%).

The Lakewood Plan continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective October 31, 1996, Dr. Hirshkowitz converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $296,937. At the time of conversion, the C-group term policy's conversion credit balance was $227,084.21, and $215,730 of that amount ($227,084.21 x 95%) was transferred to the C-group conversion UL policy for potential earning. Dr. Hirshkowitz will earn these credits in 120 equal monthly installments, beginning October 1996. The conversion credit balance of $215,730 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables: (1) Business issued before February 1, 1993, (2) male, (3) issue age 58, (4) duration of 4 years 10 months, and (5) $1 million death benefit.

### 9. Dr. Desai's Commonwealth C-Group Term Policy

Effective December 31, 1991, Commonwealth issued a $1 million C-group term policy (certificate No. 6004483) on the life of Dr. Desai, age 46. The premium for the 10-month period from December 31, 1991, through October 30, 1992, was $15,758.33, and the cost of insuring Dr. Desai for this 10-month period was $3,149.57. The Lakewood Plan paid the 10-month premium, and, at

the end of that 10-month period, the conversion credit balance was $13,081.59 ($15,758.33 - $3,149.57 + $472.83); the $472.83 is the interest of 4.5 percent earned on the conversion credit balance (($13,081.59 - $472.83) x 4.5% x 10/12 = $472.83)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The premium for the next 12-month period, before any experience refund, was $19,270. The policy was credited with an experience refund of $60, and the Lakewood Plan paid the net premium of $19,210 ($19,270 - $60). The cost of insuring Dr. Desai for the second year was $4,064.12, and, at the end of that year, the conversion credit balance was $29,560.40 ($13,081.59 + $19,270 - $4,064.12 + $1,272.93); the $1,272.93 is the interest of 4.5 percent earned on the conversion credit balance (($29,560.40 - $1,272.93) x 4.5% = $1,272.93)). Of the conversion credit balance, $14,041.19 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($29,560.40 x 47.5%).

The third-year premium for the next 12-month period, before any experience refund, was $19,750. The policy was credited with an experience refund of $474.65, and the Lakewood Plan paid the net premium of $19,275.35 ($19,750 - $474.65). The cost of

insuring Dr. Desai for the third year was $4,449.23, and, at the end of that year, the conversion credit balance was $46,879.92 ($29,560.40 + $19,750 - $4,449.23 + $2,018.75); the $2,018.75 is the interest of 4.5 percent earned on the conversion credit balance (($46,879.92 - $2,018.75) x 4.5% = $2,018.75)). Of the conversion credit balance, $42,309.13 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its third year ($46,879.92 x 90.25%).

The Lakewood Plan continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective October 1, 1996, Dr. Desai converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $151,656. At the time of conversion, the C-group term policy's conversion credit balance was $84,397.58, and $80,177.70 of that amount ($84,397.58 x 95%) was transferred to the C-group conversion UL policy for potential earning. Dr. Desai will earn these credits in 120 equal monthly installments, beginning October 1996. The conversion credit balance of $80,177.70 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables: (1) Business issued before February 1, 1993, (2) male, (3) issue age 46, (4) duration of 4 years 10 months, and (5) $1 million death benefit.

### 10.  Dr. Sobo's Commonwealth C-Group Term Policy

Effective December 31, 1991, Commonwealth issued a $1 million C-group term policy (certificate No. 6004474) on the life of Dr. Sobo, age 39.  The premium for the 10-month period from December 31, 1991, through October 30, 1992, was $9,583.33, and the cost of insuring Dr. Sobo for this 10-month period was $2,079.88.  The Lakewood Plan paid the 10-month premium, and, at the end of that 10-month period, the conversion credit balance was $7,784.83 ($9,583.33 - $2,079.88 + $281.38); the $281.38 is the interest of 4.5 percent earned on the conversion credit balance (($9,583.33 - $281.38) x 4.5% x 10/12 = $281.38)).  None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The premium for the next 12-month period, before any experience refund, was $11,620.  The policy was credited with an experience refund of $20, and the Lakewood Plan paid the net premium of $11,600 ($11,620 - $20).  The cost of insuring Dr. Sobo for the second year was $2,588.77.

On February 3, 1994, the Lakewood Plan paid Ms. Sobo $1 million as the beneficiary of this policy.  Pursuant to the plan, Dr. Sobo's death benefit should have been $2,682,858 (prior-year compensation of $329,185 multiplied by 8.15).  The Lakewood Plan had assets from which it could have paid Ms. Sobo more than the

$1,150,000 that it did (the $1 million on this policy and the $150,000 on certificate No. 6000971).  The Lakewood Plan retained those assets for the remaining covered employees.

   11.  Dr. Sankhla's Commonwealth MG-5 Policy

Effective December 31, 1991, Commonwealth issued a $150,000 MG-5 policy on the life of Dr. Sankhla, age 38, for a 1-year premium of $397.50.  The policy was renewed for a second year at a premium of $397.50, and for a third year at a premium of $397.50.  The Lakewood Plan paid all three of these premiums.

   12.  Dr. Hirshkowitz' Commonwealth C-Group Term Policy

Effective December 31, 1993, Commonwealth issued a $100,000 C-group term policy (certificate No. 6022354) on the life of Dr. Hirshkowitz, age 60.  The premium for the 10-month period from December 31, 1993, through October 30, 1994, was $4,496.67, and the cost of insuring Dr. Hirshkowitz for that 10-month period was $1,107.84.  The Lakewood Plan paid the 10-month premium, and, at the end thereof, the conversion credit balance was $3,515.91 ($4,496.67 - $1,107.84 + $127.08); the $127.08 is the interest of 4.5 percent earned on the conversion credit balance (($3,515.91 - $127.08) x 4.5% x 10/12 = $127.08)).  None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

In addition to its purchase of these 12 life insurance policies, the Lakewood Plan, during the subject years, purchased three group annuities designated for certain Lakewood employees. None of these annuities funded the life insurance provided under the plan. The Lakewood Plan generally purchased these annuities to accumulate wealth to pay future premiums on the C-group term policies. The attributes of these annuities are as follows.

### 1. Plus II Group Annuity

Effective December 31, 1990, Inter-American issued to the Lakewood Plan a Plus II group annuity (#C15518/C91063). The Lakewood Plan deposited $78,240 into the annuity on the day it was effective and $92,700 in 1991. The Lakewood Plan closed the annuity in April 1997, withdrawing $230,169.02. The $59,229.02 difference between the total deposits ($170,940) and the amount withdrawn ($230,169.02) represents interest.

### 2. Commonwealth Sygnet 24 Group Annuity Effective in 1991

Effective October 31, 1991, Commonwealth issued to the Lakewood Plan a Sygnet 24 group annuity (#D10120/D90039). This annuity is designed for asset accumulation over a long period of time and has surrender charges that grade off over 6 years. The Lakewood Plan deposited $242 into the annuity on the day it was effective, $143,344.17 in 1992, and $33,664.37 in 1993. The Lakewood Plan withdrew $76,442.08 from the annuity on November 4, 1994, and $93,301.59 on December 12, 1995, in closing it. The

Lakewood Plan used both withdrawals to pay C-group term policy premiums for Drs. Hirshkowitz and Desai. The Lakewood Plan paid $30,153.10 of charges on its deposits and $4,138.44 of surrender charges on its withdrawals. The $26,784.67 difference between the (1) total deposits into the account ($177,250.54) and (2) sum of the charges ($34,291.54) plus total withdrawals ($169,743.67), represents interest.

### 3. Commonwealth Sygnet 24 Group Annuity Effective in 1993

Effective December 30, 1993, Commonwealth issued to the Lakewood Plan a second Sygnet 24 group annuity (#D11794/D90214). The Lakewood Plan deposited $75,551.50 into the annuity on the day it was effective and closed the annuity on November 25, 1996, withdrawing $65,078.20. The Lakewood Plan paid a $15,865.68 charge on its deposit and a $3,436.85 surrender charge on its withdrawal. The $7,042.45 difference between the (1) deposit ($75,551.50) and (2) sum of the charge ($3,436.85) plus withdrawal ($65,078.20) represents interest.

Beginning in 1992, Lakewood purchased outside of the SC VEBA three Peoples Security C-group term policies. Lakewood owned these policies and deducted the underlying premiums as VEBA contributions. The attributes of these policies are as follows.

### 1. Dr. Desai's Peoples Security C-Group Term Policy

Effective August 15, 1992, Peoples Security issued a $1,005,000 C-group term policy (certificate No. 7003612) on the

life of Dr. Desai, age 46. The first-year premium was $19,004.55, and the cost of insuring Dr. Desai for that year was $3,786.22. Lakewood paid this premium, and, at the end of that year, the conversion credit balance was $15,903.15 ($19,004.55 - $3,786.22 + $684.82); the $684.82 is the interest of 4.5 percent earned on the conversion credit balance (($15,903.15 - $684.82) x 4.5% = $684.82)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $19,366.35. The policy was credited with an experience refund of $145.33, and Lakewood paid the net premium of $19,221.02 ($19,366.35 - $145.33). The cost of insuring Dr. Desai for the second year was $4,072.87, and, at the end of that year, the conversion credit balance was $32,600.48 ($15,903.15 + $19,366.35 - $4,072.87 + $1,403.85); the $1,403.85 is the interest of 4.5 percent earned on the conversion credit balance (($32,600.48 - $1,403.85) x 4.5% = $1,403.85)). Of the conversion credit balance, $15,485.23 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($32,600.48 x 47.5%).

Lakewood continued to pay the premiums on this policy, net of the applicable experience refund, through 1996. Effective February 15, 1996, Dr. Desai converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $106,353. At the time of conversion, the C-group term policy's conversion credit balance was $58,141.90, and $55,234.80 of that amount ($58,141.90 x 95%) was transferred to the C-group conversion UL policy for potential earning. Dr. Desai will earn these credits in 120 equal monthly installments, beginning February 1996. The conversion credit balance of $55,234.80 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables: (1) Business issued before February 1, 1993, (2) male, (3) issue age 46, (4) duration of 3 years 6 months, and (5) $1,005,000 death benefit.

### 2. Dr. Hirshkowitz' Peoples Security C-Group Term Policy

Effective August 15, 1992, Peoples Security issued a $940,000 C-group term policy (certificate No. 7002550) on the life of Dr. Hirshkowitz, age 59. The first-year premium was $48,861.20, and the cost of insuring Dr. Hirshkowitz for that year was $10,907.54. Lakewood paid this premium, and, at the end of that year, the conversion credit balance was $39,661.57 ($48,861.20 - $10,907.54 + $1,707.91); the $1,707.91 is the interest of 4.5 percent earned on the conversion credit balance

(($39,661.57 - $1,707.91) x 4.5% = $1,707.91)).  None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

The second-year premium, before any experience refund, was $50,440.40.  The policy was credited with an experience refund of $362.35, and Lakewood paid the net premium of $50,078.05 ($50,440.40 - $362.35).  The cost of insuring Dr. Hirshkowitz for the second year was $11,830.58, and, at the end of that year, the conversion credit balance was $81,793.61 ($39,661.58 + $50,440.40 - $11,830.58 + $3,522.21); the $3,522.21 is the interest of 4.5 percent earned on the conversion credit balance (($81,793.61 - $3,522.21) x 4.5% = $3,522.21)).  Of the conversion credit balance, $38,851.96 could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its second year ($81,793.61 x 47.5%).

Lakewood continued to pay the premiums on this policy, net of the applicable experience refund, through 1995.  Effective October 15, 1995, Dr. Hirshkowitz converted this policy to a fully paid, individually owned C-group conversion UL policy in the face amount of $164,406.  At the time of conversion, the C-group term policy's conversion credit balance was $129,411.70, and $122,941.12 of that amount ($129,411.70 x 95%) was

transferred to the C-group conversion UL policy for potential earning. Dr. Hirshkowitz will earn these credits in 120 equal monthly installments, beginning October 1995. The conversion credit balance of $122,941.12 equaled the amount referenced in Commonwealth's table of conversion credit values for the following variables: (1) Business issued before February 1, 1993, (2) male, (3) issue age 59, (4) duration of 3 years 2 months, and (5) $940,000 death benefit.

### 3. Dr. Sankhla's Peoples Security C-Group Term Policy

Effective January 31, 1993, Peoples Security issued a $500,000 C-group term policy (certificate No. 7003453) on the life of Dr. Sankhla, age 39. The first-year premium was $5,750, and the cost of insuring Dr. Sankhla for that year was $1,245.51. Lakewood paid this premium, and, at the end of that year, the conversion credit balance was $4,707.19 ($5,750 - $1,245.51 + $202.70); the $202.70 is the interest of 4.5 percent earned on the conversion credit balance (($4,707.19 - $202.70) x 4.5% = $202.70)). None of the conversion credit balance could have been transferred at this time to the C-group conversion UL policy, upon conversion thereto, because the C-group term policy was in its first year.

During the relevant years, Commonwealth, Inter-American, and Peoples Security paid Kirwan, Mr. Murphy, and Mr. Ankner (either indirectly through one of his companies or directly) commissions

of $90,503.82, $6,681.23, and $20,960, respectively, on the C-group products and Sygnet group annuities sold to the Lakewood Plan.  Kirwan also received, in or about 1996, commissions equal to 5 percent of the conversion credits, both earned and unearned, which were applied to the C-group conversion UL policies of Drs. Hirshkowitz, Desai, and McManus.  These commissions totaled $29,746.93 (($33,630 x 5%) + ($12,486 x 5%) + ($74,739 x 5%) + ($215,730 x 5%) + ($80,177.70) + ($55,234.80) + ($122,941.12 x 5%).

The 1991, 1992, and 1993 Forms W-2 issued by Lakewood to Drs. Hirshkowitz, Desai, Sobo, McManus, and Sankhla did not report any taxable life insurance benefits provided to them under the Lakewood Plan.  Dr. Hirshkowitz reported $4,590, $4,590, and $13,338 as P.S. 58 income on his joint 1991, 1992, and 1993 Federal individual income tax returns, respectively.  Drs. Desai, Sobo, McManus, and Sankhla did not report on their 1991, 1992, or 1993 Federal individual income tax returns any income from the life insurance benefits provided to them by Lakewood.

Respondent determined that Lakewood could not deduct the amounts claimed as contributions to the Lakewood Plan in its October 31, 1991, and its 1992 and 1993 taxable years and disallowed the related claimed deductions of $480,901, $209,869, and $296,056, respectively.  In contrast with the Neonatology adjustments, respondent's Lakewood adjustments do not reflect the

fact that an employee/owner (Dr. Hirshkowitz) reported P.S. 58 income as to the benefits that he received from the Lakewood Plan. Consistent with the Neonatology determination, respondent determined primarily that Lakewood's contributions to its plan were not deductible under section 162(a) to the extent they did not provide current-year life insurance protection. Respondent determined alternatively that the contributions were not deductible under section 404(a)(5); respondent determined that the Lakewood Plan was not a "welfare benefit fund" under section 419(e) but a nonqualified plan of deferred compensation subject to the rules of section 404. Respondent determined as a second alternative that, assuming that the Lakewood Plan is a "welfare benefit fund", any deduction of the contributions was precluded by section 419; for this purpose, respondent determined that the SC VEBA was not a "10-or-more employer plan" under section 419A(f)(6) as asserted by petitioners.

As to the petitioning individuals of the Lakewood group, respondent determined that each group of petitioning individuals had "additional income" in the following amounts for the respective years from 1991 through 1993: Dr. and Ms. Hirshkowitz--$254,051, $136,678, and $211,120; Dr. and Ms. Desai--$122,750, $42,056, and $55,000; Dr. and Ms. McManus--$20,000, $17,921, and $18,186; and the Estate of Steven Sobo, Deceased,

and Ms. Sobo--$83,100, $13,214, and $5,000.[20]  Respondent determined that the additional income was either constructive dividend income under section 301 or nonqualified deferred compensation under section 402(b).  As to the latter position, respondent determined that the petitioning employee/owners of the Lakewood group were taxable on their shares of the contributions, when made, because they received in connection with services property not subject to a substantial risk of forfeiture under section 83.

VII. The Marlton Plan

Marlton established the Marlton Plan under the NJ VEBA on December 31, 1993, effective January 1, 1993.  Marlton contributed $100,000 and $120,000 to the plan during 1993 and 1994, respectively, and Dr. Lo deducted those respective amounts on his 1993 and 1994 Schedules C as employee benefit program expenses.  Marlton also paid a $2,500 VEBA fee in 1993, which Dr.

---

[20] In summary, respondent determined that the disallowed contributions were attributable to the following persons:

|                  | 1991    | 1992    | 1993    |
|------------------|---------|---------|---------|
| Dr. Hirshkowitz  | $254,051 | $136,678 | $211,120 |
| Dr. Desai        | 122,750 | 42,056  | 55,000  |
| Dr. McManus      | 20,000  | 17,921  | 18,186  |
| Dr. Sobo         | 83,100  | 13,214  | 5,000   |
| Dr. Sankhla      | —       | —       | 5,750   |
| Trustee's fees   | 1,000   | —       | 1,000   |
|                  | 480,901 | 209,869 | 296,056 |

Lo deducted on his joint 1993 Federal individual income tax return.

The Marlton Plan provides in relevant part that: (1) Each person covered by the plan is entitled to a death benefit equal to eight times his or her prior-year compensation, (2) an employee's spouse may not join the plan, and (3) a proprietor may join the plan only if 90 percent or more of the plan's total participants are employees of Marlton on 1 day of each quarter of the plan year. The only persons covered by the Marlton Plan are Dr. Lo, Ms. Lo, and Edward Lo,[21] and, during 1994, the Marlton Plan purchased a separate insurance policy on the life of each of these persons. None of these persons, had he or she died, would have received a death benefit under the plan equal to eight times his or her prior-year compensation. Ms. Lo was a Marlton employee during 1994, and it paid her, ostensibly as employee compensation, $46,800, $51,600, and $54,000 during the respective years from 1992 to 1994. Edward Lo was an employee of Marlton during 1994, and it paid him, ostensibly as employee compensation, $39,930, $39,358, and $37,918 during the years 1992 through 1994. Dr. Lo was never a Marlton employee, and he was not eligible to participate in the plan during any of the

---

[21] The record does not reveal Edward Lo's relationship (if any) to Dr. Lo.

relevant years.  Dr Lo's participation in the plan was inconsistent with the terms thereof.

On April 28, 1994, the Marlton Plan purchased from Southland Life Insurance Co. (Southland) a $3.2 million flexible premium adjustable life insurance policy (certificate No. 0600008928) on the life of Dr. Lo, age 52, and it paid Southland a $158,859 premium on the policy during that year.[22]  Dr. Lo's death beneficiary was an irrevocable trust by and between him and Ms. Lo, as grantors, and Edward Lo as trustee.  The policy's cash value (i.e., its accumulation value[23] less surrender charges) could be obtained by surrendering the policy, but the product was designed to access that value by borrowing it through a "wash loan" (i.e., a loan for which the interest rate charged thereon equaled the interest rate earned on the policy).  The Southland policy's accumulated value was $154,483 on December 28, 1994, its surrender charge for that year was $68,800, and the interest credited to the policy during that year approximated $5,046.96.  For 1994, a $3.2 million term insurance policy on the life of Dr. Lo would have cost approximately $9,255.05.

---

[22] Under the terms of the policy, after Southland received an initial premium payment of $98,859, a minimum monthly premium payment of $3,738.33 was required to prevent the policy from lapsing during the first 5 years.

[23] The accumulation value equaled the total premiums paid plus commercial interest less the cost of term insurance and administrative expenses.

Also during 1994, the Marlton Plan purchased from the First Colony Life Insurance Co. (First Colony) a $412,800 graded premium policy on the life of Ms. Lo, age 44, and a $264,008 graded premium policy on the life of Edward Lo, age 45.  The Marlton Plan paid First Colony a $584.26 annual premium on Ms. Lo's policy and a $556.34 annual premium on Edward Lo's policy. The beneficiary of both policies was the Marlton plan trustee. The annual premium on these two policies remained constant for the first 10 years and then increased substantially unless the policyholder provided evidence of insurability to begin another 10-year period of reduced, level premiums.

The Marlton Plan paid no benefits during the subject years. On their joint 1993 Federal individual income tax return, the Los reported no P.S. 58 income.  They reported P.S. 58 income of $4,288 on their joint 1994 Federal individual income tax return.

Respondent determined that Marlton could not deduct its contributions to the Marlton Plan and increased the Los' income by $102,500 in 1993 and $116,212 in 1994 to reflect the following adjustments:

|  | 1993 | 1994 |
|---|---|---|
| Contributions to the Marlton Plan | $100,000 | $120,000 |
| Administrator's fees | 2,500 | 500 |
| Subtotal | 102,500 | 120,500 |
| Less: P.S. 58 costs included in income | -0- | 4,288 |
| Adjustment | 102,500 | 116,212 |

Respondent determined primarily that the contributions were not deductible under section 162(a). Respondent determined alternatively that the contributions were not deductible under section 404(a)(5); respondent determined that the Marlton Plan was not a "welfare benefit fund" under section 419(e) but a nonqualified plan of deferred compensation subject to the rules of section 404. Respondent determined as a second alternative that, assuming that the Marlton Plan is a "welfare benefit fund", any deduction of the contributions was precluded by section 419; for this purpose, respondent determined that the NJ VEBA was not a "10-or-more employer plan" under section 419A(f)(6) as asserted by petitioners. Respondent determined as a third alternative that any deduction of the contributions was precluded by section 264(a); for this purpose, respondent determined that each life insurance policy issued under the Marlton Plan covered the life of a person financially interested in Dr. Lo's trade or business and that Dr. Lo was directly or indirectly a beneficiary under the policy.

## OPINION

We must determine the tax consequences flowing from the subject VEBA's, which, petitioners claim, are "10-or-more employer plans" entitled to the favorable tax treatment set forth

in section 419A(f)(6).[24]  The VEBAs' framework was crafted by the insurance salesmen mentioned herein and marketed to professional, small business owners as a viable tax planning device.  The VEBAs' scheme was subscribed to by varied small businesses whose employee/owners sought primarily the advertised tax benefits and

---

[24] The term "10-or-more employer plan" is defined by sec. 419A(f)(6), which provides as follows:

> (6) Exception for 10-or-More Employer Plans.--

> (A) In general.--This subpart [i.e., the rules of subpt. D that generally limit an employer's deduction for its contributions to a welfare benefit fund to the amount that would have been deductible had it provided the benefits directly to its employees] shall not apply in the case of any welfare benefit fund which is part of a 10 or more employer plan.  The preceding sentence shall not apply to any plan which maintains experience-rating arrangements with respect to individual employers.

> (B) 10 or more employer plan.--For purposes of subparagraph (A), the term "10 or more employer plan" means a plan--

>> (i) to which more than 1 employer contributes, and

>> (ii) to which no employer normally contributes more than 10 percent of the total contributions contributed under the plan by all employers.

See generally Booth v. Commissioner, 108 T.C. 524, 562-563 (1997), for a discussion of the tax consequences which flow from a 10-or-more employer plan vis-a-vis another type of welfare benefit fund, on the one hand, or a plan of deferred compensation, on the other hand.

tax-free asset accumulation.  The subject VEBA's were not designed, marketed, purchased, or sold as a means for an employer to provide welfare benefits to its employees.  Cf. Booth v. Commissioner, 108 T.C. 524, 561-563 (1997) (designers of welfare benefit funds intended to provide employees with real welfare benefits that would not be subject to abuse).  The small business owners at bar (namely, the petitioning physicians) invested in the VEBA's through their businesses and caused their businesses to purchase the C-group product from the insurance salesmen.  The insurance salesmen, guided by the designer of the C-group product, represented to the physicians that favorable tax consequences would flow from an investment in the VEBA's and the purchase of the C-group product.

Before turning to the issues at hand, we pause to pass on our perception of the trial witnesses.  We observe the candor, sincerity, and demeanor of each witness in order to evaluate his or her testimony and assign it weight for the primary purpose of finding disputed facts.  We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case.  The mere fact that one party presents unopposed testimony on his or her behalf does not necessarily mean that the elicited testimony will result in a finding of fact in that party's favor.  We will not accept the testimony of

witnesses at face value if we find that the outward appearance of the facts in their totality conveys an impression contrary to the spoken word.  See Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Wilmington Trust Co. v. Helvering, 316 U.S. 164, 167-168 (1942); see also Gallick v. Baltimore & O. R. Co., 372 U.S. 108, 114-115 (1963); Diamond Bros. Co. v. Commissioner, 322 F.2d 725, 730-731 (3d Cir. 1963), affg. T.C. Memo. 1962-132.

Petitioners called eight fact witnesses and one expert witness.  Petitioners' fact witnesses were Drs. Desai, Hirshkowitz, and Mall, Messrs. Ankner, Mall, and Ross, and AEGON USA employees Paula Jackson and Timothy Vance.  Petitioners' expert witness was Jay M. Jaffe, F.S.A., M.A.A.A. (Mr. Jaffe). Mr. Jaffe is the president and sole consultant of Actuarial Enterprises, Ltd., and we generally recognized him as an expert on the characterization of an insurance policy as term insurance. We recognized him as such but expressed concern as to whether he was actually an unbiased expert who could help us.  Mr. Jaffe generally testified that the C-group term policy and the C-group conversion UL policy were separate insurance products with no interrelationship.

Respondent called two fact witnesses and one expert witness. Respondent's fact witnesses were Mr. Cohen and Vincent Maressa, the latter of whom is the executive director and general counsel of the Medical Society of New Jersey.  Respondent's expert

witness was Charles DeWeese, F.S.A., M.A.A.A. (Mr. DeWeese). Mr. DeWeese is an independent consulting actuary, and we recognized him as an expert on, among other things, the difference between group term insurance and universal life insurance. Mr. DeWeese generally testified that the C-group term policy and the C-group conversion UL policy were one insurance product; i.e., both policies were parts of a single life insurance product.

We have broad discretion to evaluate the cogency of an expert's analysis. Sometimes, an expert will help us decide a case. See, e.g., Booth v. Commissioner, supra at 573; Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 302 (1996); see also M.I.C. Ltd. v. Commissioner, T.C. Memo. 1997-96; Proios v. Commissioner, T.C. Memo. 1994-442. Other times, he or she will not. See, e.g., Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997); Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996). We weigh an expert's testimony in light of his or her qualifications and with due regard to all other credible evidence in the record. See Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119. We may embrace or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion we choose to adopt. See Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976),

affg. T.C. Memo. 1974-285; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 562 (1986); see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506.  We are not bound by an expert's opinion and will reject an expert's opinion to the extent that it is contrary to the judgment we form on the basis of our understanding of the record as a whole.  See Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Silverman v. Commissioner, supra at 933; Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; IT&S of Iowa, Inc. v. Commissioner, supra at 508; Chiu v. Commissioner, 84 T.C. 722, 734 (1985); see also Gallick v. Baltimore & O. R. Co., supra at 115; In re TMI Litig., 193 F.3d 613, 665-666 (3d Cir. 1999).

Mr. DeWeese is no stranger to this Court.  He testified in Booth v. Commissioner, 108 T.C. 524 (1997), as an expert on multiple employer plans.  We find him to be reliable, relevant, and helpful.  We credit his opinion as set forth in his report and as clarified at trial.  We rely on his opinion in making our findings of fact and reaching the conclusions we draw therefrom.

Mr. Jaffe helped us minimally.[25]  He admitted at trial that he works with Commonwealth in its everyday business operation, including helping it develop an innovative term life insurance product and rendering critical advice to it on an unrelated litigation matter.  An expert witness loses his or her impartiality when he or she is too closely connected with one of the parties.  See, e.g., Estate of Kaufman v. Commissioner, supra (the Commissioner's expert was inherently biased because he was the Commissioner's employee).  An expert witness also is unhelpful when he or she is merely a biased spokesman for the advancement of his or her client's litigating position.  When we see and hear an expert who displays an unyielding allegiance to the party who is paying his or her bill, we need not and generally will not hesitate to disregard that testimony as untrustworthy.  See Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 129 (1989); see also Jacobson v. Commissioner, T.C. Memo. 1989-606 (when experts act as advocates, "the experts can be viewed only as hired guns of the side that retained them, and this not only disparages their professional status but precludes their assistance to the Court in reaching a proper and reasonably accurate conclusion").

---

[25] In addition to the reasons stated infra, Mr. Jaffe's knowledge of critical facts was generally influenced by his relationship with Commonwealth, he relied incorrectly on erroneous data to reach otherwise unsupported conclusions, and he concededly did not review all pertinent facts.

We also do not find the testimony of most of the fact witnesses to be helpful as to the critical facts underlying the issues at hand.  Drs. Desai, Hirshkowitz, and Mall and Messrs. Ankner, Mall, and Ross testified incredibly with regard to material aspects of this case.  They all seemed coached and frequently displayed during cross-examination (or in response to questions asked by the Court) a loss of memory or hesitation with respect to their testimony.[26]  Each of them (with the exception of Dr. Desai and Mr. Mall) also acknowledged that he or she had on prior occasions consciously misrepresented material facts in order to achieve a personal goal.  Their testimony, as well as the testimony of Mr. Cohen, was for the most part self-serving, vague, elusive, uncorroborated, and/or inconsistent with documentary or other reliable evidence.  Under circumstances such as these, we are not required to, and we do not, rely on the bald or otherwise unreliable testimony of these named fact witnesses to support our decision herein.  See Diamond Bros. Co. v. Commissioner, 322 F.2d 725 at 730-731; see also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  We rely mainly on the testimony of Mr. DeWeese and the voluminous record built by the parties through their stipulation of approximately 2,167 facts and approximately 1,691 exhibits.

---

[26] In fact, petitioners' counsel Neil L. Prupis (Mr. Prupis) even acknowledged to the Court that the testifying physicians had selective memories.

We turn to the nine issues for decision and address each of these issues seriatim.

## 1. Contributions to the Neonatology and Lakewood Plans

We decide first the question of whether section 162(a) allows Neonatology and Lakewood to deduct their contributions to their plans. Section 162(a) generally provides a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. A taxpayer must meet five requirements in order to deduct an item under this section. The taxpayer must prove that the item claimed as a deductible business expense: (1) Was paid or incurred during the taxable year; (2) was for carrying on his, her, or its trade or business; (3) was an expense; (4) was a necessary expense; and (5) was an ordinary expense. See Commissioner v. Lincoln Savs. & Loan Association, 403 U.S. 345, 352 (1971); Welch v. Helvering, 290 U.S. 111, 115 (1933). A determination of whether an expenditure satisfies each of these requirements is a question of fact. See Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

Petitioners argue that Neonatology and Lakewood meet all five requirements with respect to their contributions to their plans, and, hence, petitioners assert, those contributions are fully deductible under section 162(a). Petitioners contend that the contributions were paid as compensation because, they assert, the contributions funded a fringe benefit in the form of term

life insurance.  Petitioners assert that the contributions all were made to the plans to pay premiums on term life insurance and that the premiums entitled the insureds to nothing more.

Respondent argues that section 162(a) does not allow Neonatology and Lakewood to deduct their contributions in full. Respondent concedes that Neonatology and Lakewood may deduct their contributions to their plans to the extent that the contributions funded term life insurance.  See sec. 1.162-10(a), Income Tax Regs.; see also Joel A. Schneider, M.D., S.C. v. Commissioner, T.C. Memo. 1992-24; Moser v. Commissioner, T.C. Memo. 1989-142, affd. on other grounds 914 F.2d 1040 (8th Cir. 1990).  As to the excess contributions, respondent asserts, those amounts are not deductible under section 162(a).  Respondent argues primarily that the excess contributions are distributions of surplus cash and not ordinary and necessary business expenses. Respondent points to the fact that the only benefit provided explicitly under the plans was term life insurance and asserts that the excess contributions did not fund this benefit.

We agree with respondent that the excess contributions which Neonatology and Lakewood made to their plans are nondeductible distributions of cash for the benefit of their employee/owners and do not constitute ordinary or necessary business expenses.[27]

---

[27] We need not and do not decide the correctness of respondent's alternative determinations disallowing deductions of

(continued...)

The Neonatology Plan and the Lakewood Plan are primarily vehicles which were designed and serve in operation to distribute surplus cash surreptitiously (in the form of excess contributions) from the corporations for the employee/owners' ultimate use and benefit. Although the plans did provide term life insurance to the employee/owners, the excess contributions simply were not attributable to that current-year protection. The excess contributions, which represent the lion's share of the contributions, were paid to Inter-American, Commonwealth, or Peoples Security, as the case may be, to be set aside in an interest-bearing account for credit to the C-group conversion UL policy, upon conversion thereto, and it was the holders of these policies (namely, the employee/owners) who benefited from those excess contributions by way of their ability to participate in the C-group products.[28] We find incredible petitioners' assertion that the employee/owners of Neonatology and Lakewood, each of whom is an educated physician, would have caused their respective corporations to overpay substantially for term life insurance with no promise or expectation of receiving the excess

---

[27](...continued) these excess contributions.

[28] The distributing corporations (Neonatology and Lakewood), on the other hand, received little if any benefit from the excess contributions to the plans.

contributions back.  The premiums paid for the C-group term policy exceeded by a wide margin the cost of term life insurance.

We recognize that the conversion credit balance in a C-group term policy would be forfeited completely were the policy to lapse and not be converted.  Such was the case, for example, when Neonatology let Dr. Mall's Inter-American C-group term policy lapse on March 15, 1992;[29] in that case, Dr. Mall forfeited the conversion credit balance of $8,585.88.  Petitioners focus on the possibility and actual occurrence of such a forfeiture and conclude therefrom that the premiums are all attributable to current life insurance protection.  We disagree with this conclusion.  The mere fact that a C-group term policyholder may forfeit the conversion credit balance does not mean, as petitioners would have it, that the balance was charged or paid as the cost of term life insurance.  The current-year insurance purchased from Inter-American on the life of Dr. Mall cost only $1,689.85 for the certificate year then ended, and the fact that Neonatology choose to deposit with Inter-American an additional $8,216.05 ($9,906 premium less $1,689.85 cost of insurance) expecting that Dr. Mall would eventually receive that deposit

---

[29] Other C-group term policies which lapsed during the Neonatology and Lakewood subject years without conversion were the other two Inter-American C-group term policies; i.e., the ones owned by Drs. Hirshkowitz and Desai.  Although petitioners do not explain why these policies were allowed to lapse without conversion, we note that the lapse of these policies occurred right after Inter-American's forced liquidation.

with commercial interest does not recharacterize the deposited funds as the cost of term insurance simply because Neonatology ultimately decided to abandon the funds. Although it is true that Neonatology and the insurancemen represented in form that Neonatology paid the entire $9,906 to Inter-American as a premium on term life insurance, the fact of the matter is that neither Neonatology nor Inter-American actually considered the excess premium to fund the cost of term life insurance. The substance of the purported premium payment outweighs its form, and, after closely scrutinizing the facts and circumstances of this case, including especially the interrelationship between the two policies underlying the C-group product and the expectations and understandings of the parties to the contracts underlying that product, we are left without any doubt that the amount credited to the conversion account balance was neither charged nor paid as the cost of current life insurance protection. The parties to those contracts have always expected and understood that the conversion credit balance would be returned to the insured in the future by way of no-cost policy loans.

We also recognize that the conversion credit balance would not be paid in addition to the underlying policy's face value when the insured died, and, if the insured had borrowed from the balance, that the death benefit would be reduced by the amount of any outstanding loan. In the case of Dr. Sobo, for example, his

beneficiary, Ms. Sobo, received upon his death only the face value of the two C-group term policies which were then outstanding on his life. Neither she nor anyone else was entitled to, or actually received, the conversion credit balance on either policy. For the reasons stated immediately above, we do not believe that this "forfeiture" provision changes the fact that the amount credited to the conversion credit balance was simply a deposit that could either grow with interest, or, in the case of Dr. Sobo, dissipate, and that this deposit was insufficiently related to the current life insurance protection to label it as such.[30]

We conclude that the excess contributions are disguised (constructive) distributions to the petitioning employee/owners of Neonatology and Lakewood, see Mazzocchi Bus Co., Inc. v. Commissioner, 14 F.3d 923, 927-928 (3d Cir. 1994), affg. T.C. Memo. 1993-43; Commissioner v. Makransky, 321 F.2d 598, 601-603 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Truesdell v. Commissioner, 89 T.C. 1280 (1989); see also Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929) (individual taxpayer constructively received income to the extent corporate employer agreed to pay his tax bill), which means, in turn, that the

---

[30] Neither party has suggested that Dr. Sobo, upon death, is entitled to deduct a loss equal to the conversion credit balance, and we do not decide that issue.

distributing corporations cannot deduct those payments.[31]  The fact that neither Lakewood nor Neonatology formally declared these excess contributions as cash distributions does not foreclose our finding that the excess contributions were distributions-in-fact.  See Commissioner v. Makransky, supra at 601; Truesdell v. Commissioner, supra at 1295; see also Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974); Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84.  What is critical to our conclusion is that the excess contributions made by Neonatology and Lakewood conferred an economic benefit on their employee/owners for the primary (if not sole) benefit of those employee/owners, that the excess contributions constituted a distribution of cash rather than a payment of an ordinary and necessary business expense, and that neither Neonatology nor Lakewood expected any repayment of the cash underlying the conferred benefit.[32]  See Noble v.

---

[31] In addition to the deeply ingrained principle that a corporation may not deduct a distribution made to its shareholder, the subject distributions neither funded a plan benefit nor are viewed as passing directly from the corporation to the plan.  See Enoch v. Commissioner, 57 T.C. 781, 793 (1972) (distributions deemed to have passed from the distributing corporation to the recipient shareholder and then to the third-party actual recipient).

[32] That the distributing corporations and/or the employee/owners may not have intended that the excess contributions constitute a taxable distribution does not preclude
(continued...)

Commissioner, supra at 443; see also Loftin & Woodard, Inc. v.
United States, supra at 1214-1215; Crosby v. United States, supra
at 1388; Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980).

Petitioners argue that the excess contributions were paid to
the employee/owners as compensation for their services. We
disagree. Whether amounts are paid as compensation turns on the
factual determination of whether the payor intends at the time
that the payment is made to compensate the recipient for services
performed. See Whitcomb v. Commissioner, 733 F.2d 191, 194 (1st
Cir. 1984), affg. 81 T.C. 505 (1983); King's Ct. Mobile Home
Park, Inc. v. Commissioner, 98 T.C. 511, 514-515 (1992); Paula
Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972),
affd. without published opinion 474 F.2d 1345 (5th Cir. 1973).
The intent is not found, as petitioners would have it, at or
after the time that respondent challenges the payment's
characterization as something other than compensation. See
King's Ct. Mobile Home Park, Inc. v. Commissioner, supra at 514;
Paula Constr. Co. v. Commissioner, supra at 1059-1060; Joyce v.
Commissioner, 42 T.C. 628, 636 (1964); Drager v. Commissioner,
T.C. Memo. 1987-483. The mere fact that petitioners now choose

---

[32](...continued)
dividend treatment. Nor is it precluded because the corporations
did not formally distribute the cash directly to the
owner/employees. See Loftin & Woodard, Inc. v. United States,
577 F.2d 1206, 1214 (5th Cir. 1978); Crosby v. United States, 496
F.2d 1384, 1388 (5th Cir. 1974).

to characterize the excess contributions as compensation does not necessarily mean that the payments were compensation in fact.

The facts of this case do not support petitioners' assertion that Neonatology and Lakewood had the requisite compensatory intent when they made the contributions to their plans. We find nothing in the record, except for petitioners' assertions on brief, that would support such a finding. See Rule 143(b) (statements on brief are not evidence). Indeed, all reliable evidence points to the contrary conclusion that we reach as to this issue. On the basis of our review of the record, we are convinced that the purpose and operation of the Neonatology Plan and the Lakewood Plan was to serve as a tax-free savings device for the owner/employees and not, as asserted by petitioners, to provide solely term life insurance to the covered employees. To be sure, some of the plans even went so far as to purchase annuities for designated employee/owners.

## 2. Lakewood's Payments Made Outside of Its Plan

Lakewood made payments outside of the Lakewood Plan for additional life insurance for two of its employees. Lakewood argues that these payments are deductible in full under section 162(a) as ordinary and necessary business expenses. We disagree. For the reasons stated above, we hold that these payments are nondeductible constructive distributions to the extent they did not fund term life insurance. The payments are deductible to the

extent they did fund term life insurance for the relevant
employees.

## 3. Neonatology Contributions as to Mr. Mall

Neonatology contributed money to the Neonatology Plan for
the benefit of Mr. Mall. Mr. Mall was neither an employee of
Neonatology nor an individual who was eligible to participate in
Neonatology's Plan. We conclude that these contributions served
no business purpose of Neonatology, and, hence, that they were
not ordinary and necessary expenses paid to carry on
Neonatology's business. See sec. 1.162-10(a), Income Tax Regs.;
see also Joel A. Schneider, M.D., S.C. v. Commissioner, T.C.
Memo. 1992-24; Moser v. Commissioner, T.C. Memo. 1989-142. The
contributions are nondeductible constructive distributions to Dr.
Mall.[33]

## 4. & 5. Marlton Contributions as to Dr. Lo and Its Two Employees

Marlton contributed money to the Marlton Plan to purchase
life insurance on the lives of three individuals; namely, Dr. Lo,
Ms. Lo, and Edward Lo. As to Dr. Lo, he was neither a Marlton
employee nor an individual who was eligible to participate in
Marlton's plan. We conclude that the contributions made on his
behalf served no legitimate business purpose of Marlton, and,

---

[33] We view Dr. Mall, Neonatology's sole shareholder, as
having directed her corporation to make these contributions on
behalf of her husband. Accordingly, we view these contributions
as passing first through Dr. Mall on the way to the Neonatology
Plan.

hence, that they were not ordinary and necessary expenses paid to carry on Marlton's business. See sec. 1.162-10(a), Income Tax Regs.; see also Joel A. Schneider, M.D., S.C. v. Commissioner, supra; Moser v. Commissioner, supra. In contrast with Neonatology's contributions to purchase insurance on the life of Mr. Mall, which we have just held were a constructive distribution to Dr. Mall, the contributions which Marlton made on behalf of Dr. Lo are not a constructive distribution to him because Marlton is not a corporation.

As to Ms. Lo, she was a Marlton employee. Under section 264(a)(1), however, a taxpayer may not deduct life insurance premiums to the extent that the taxpayer is "directly or indirectly a beneficiary" of the underlying policy.[34] Sec. 264(a)(1). Respondent argues that section 264(a)(1) applies to disallow Marlton's deduction of the contributions that it made to pay the premiums on Ms. Lo's term life insurance policy because,

---

[34] Sec. 264(a)(1) provides:

SEC. 264. CERTAIN AMOUNTS PAID IN CONNECTION WITH
        INSURANCE CONTRACTS.

        (a) General Rule.--No deduction shall be allowed
for--

                (1) Premiums paid on any life insurance
        policy covering the life of any officer or
        employee, or of any person financially
        interested in any trade or business carried
        on by the taxpayer, when the taxpayer is
        directly or indirectly a beneficiary under
        such policy.

respondent asserts, the policy's beneficiary was a grantor trust formed by the Los.

We agree with respondent's conclusion that section 264(a)(1) prevents Marlton from deducting the contributions which it made to its plan to pay the premiums on Ms. Lo's term life insurance policy. We do so, however, for reasons different from the reason espoused by respondent. As we see it, Marlton's deduction of its contributions for Ms. Lo's life insurance policy turns on whether Marlton[35] was "directly or indirectly a beneficiary" of that policy within the meaning of section 264(a)(1). If it was, the premiums are not deductible, regardless of whether they would otherwise be deductible as a business expense. See Carbine v. Commissioner, 83 T.C. 356, 367-368 (1984) (and cases cited thereat), affd. 777 F.2d 662 (11th Cir. 1985); Glassner v. Commissioner, 43 T.C. 713, 715 (1965), affd. per curiam 360 F.2d 33 (3d Cir. 1966); sec. 1.264-1(a), Income Tax Regs.

Respondent asserts that the policy's beneficiary was the Los' grantor trust. We are unable to find that such was the case. As we view the record, and as we found supra, the beneficiary of Ms. Lo's term life insurance policy was the Marlton Plan. Although the trust to which respondent refers was indeed the beneficiary of Dr. Lo's policy, we find nothing in the

---

[35] For the purpose of our inquiry, we view Marlton, a sole proprietorship, as an alter ego of Dr. Lo, the sole proprietor.

record to suggest that the same trust also was the beneficiary of Ms. Lo's policy. Nor has respondent pointed us to any part of the record that would support such a finding.

We ask whether Dr. Lo is a direct or indirect beneficiary of Ms. Lo's term life insurance policy given the fact that the Marlton Plan is the named beneficiary. We conclude that he is.[36] In the event of Ms. Lo's death, the face value of her life insurance policy would be paid to the Marlton Plan, for which Dr. Lo and Edward Lo would be the remaining beneficiaries. Although Dr. Lo would not be the sole beneficiary of those death benefits, section 264(a)(1) requires only that he be a beneficiary in order to render the premiums nondeductible. See Keefe v. Commissioner, 15 T.C. 947, 952-953 (1950). Nor does it matter for purposes of section 264(a)(1) that he was not expressly listed on Ms. Lo's policy as the beneficiary thereof. See Rieck v. Heiner, 25 F.2d 453 (3d Cir. 1928).

Dr. Lo, as opposed to Edward Lo, also stood to gain the most from the plan assets, were Ms. Lo to have died. Whereas Edward Lo had a fairly inexpensive term life insurance policy, Dr. Lo had a fairly expensive universal life policy. Ms. Lo's life insurance proceeds also could be used to pay the premiums on the

---

[36] For the same reasons as stated infra, we also conclude that Dr. Lo is a direct or indirect beneficiary of Edward Lo's term life insurance policy, and, hence, that Marlton may not deduct the contributions that it made to its plan to pay his premiums.

policies, thus satisfying the obligation of Marlton to do so. See Rodney v. Commissioner, 53 T.C. 287, 318-319 (1969) (benefit requirement of section 264(a)(1) is satisfied where the insurance would ultimately satisfy an obligation of the taxpayer); Glassner v. Commissioner, supra (same).

6. Disallowed Payments

A corporate distribution is taxed as a dividend to the recipient shareholder to the extent of the corporation's earnings and profits. The portion of the distribution that is not a dividend is a nontaxable return of capital to the extent of the shareholder's stock basis. The remainder of the distribution is taxed to the shareholder as gain from the sale or exchange of property. See sec. 301(c); Enoch v. Commissioner, 57 T.C. 781, 793 (1972); see also Commissioner v. Makransky, 321 F.2d at 601.

Petitioners do not challenge respondent's determination that Lakewood and Neonatology had sufficient earnings and profits to characterize the subject distributions as dividends. We sustain respondent's determination that all the distributions are taxable dividends to the recipient employee/owners. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Petitioners challenge the timing of that income, however, arguing that it is not taxable to the employee/owners in the year determined by respondent; i.e., the year in which Neonatology and Lakewood contributed the excess amounts to their plans or, in the

three instances where the insurance was purchased directly from Peoples Security, in the year that Lakewood paid Peoples Security for that insurance. Petitioners assert that the income is not taxable to the employee/owners until after the subject years because the conversion credit balance would be forfeited if the underlying policy lapsed or if the insured died. Petitioners observe that the employee/owners' ability to withdraw the conversion credit balance was limited to the percentage of that balance that was transferred to the C-group conversion UL policy. Petitioners observe that the transferred credits could be reached by an insured only if a C-group term policy was converted to a C-group conversion UL policy, and then only in equal increments over 120 months. Petitioners observe that an insured would forfeit the transferred credits in the event of his or her death. Petitioners rely primarily on section 83(a).

Respondent argues that the income is taxable currently. Respondent asserts that the excess contributions purchased insurance contracts and annuities for the benefit of the employee/owners. Respondent asserts that the employee/owners had the unfettered ability to withdraw the conversion credit balances at their whim.

We agree with respondent that the dividends are taxable in the years that he determined. As mentioned supra, we view Neonatology and Lakewood's excess contributions to their plans as

passing first through the employee/owners.  We view likewise the

excess payments which Lakewood made directly to Peoples Security.

Accordingly, in both cases, the employee/owners are considered

for purposes of the Federal tax law to have received the excess

contributions (or payments) when the contributions (or payments)

were first made.

Petitioners rely mistakenly on section 83 to argue that the

individual petitioners may not be taxed currently on the excess

contributions.[37]  Section 83 has no application to a case such as

_____

[37] Sec. 83 provides in relevant part:

SEC. 83.   PROPERTY TRANSFERRED IN CONNECTION WITH
           PERFORMANCE OF SERVICES.

(a) General Rule.--If, in connection with the
performance of services, property is transferred to any
person other than the person for whom such services are
performed, the excess of--

(1) the fair market value of such
property (determined without regard to any
restriction other than a restriction which by
its terms will never lapse) at the first time
the rights of the person having the
beneficial interest in such property are
transferable or are not subject to a
substantial risk of forfeiture, whichever
occurs earlier, over

(2) the amount (if any) paid for such
property,

shall be included in the gross income of the person who
performed such services in the first taxable year in
which the rights of the person having the beneficial
interest in such property are transferable or are not
subject to a substantial risk of forfeiture, whichever

(continued...)

this where a corporation makes a cash distribution for the benefit of a shareholder, even when, as is the case here, that shareholder is also an employee of the distributing corporation. Section 83 requires a transfer of property in connection with the performance of services, see sec. 83(a), and, as explained supra, such a requirement is not met in the case of a distribution.

## 7. Accuracy-Related Penalties

Respondent determined that each petitioner was liable for an accuracy-related penalty under section 6662(a) and (b)(1) for negligence or intentional disregard of rules and regulations. Petitioners argue that none of them are so liable. Petitioners assert that they were "approached by various professionals" who introduced petitioners to the VEBA's and that they invested in the VEBA's relying on "tax opinion letters written by tax attorneys and accountants and discussions with insurance brokers". Petitioners assert that the accountants who prepared their returns agreed with the reporting position taken as to the contributions, as evidenced by the fact that the accountants prepared the returns in the manner they did. Petitioners assert that many of the issues at bar are matters of first impression, which, petitioners conclude, means they cannot be liable for an accuracy-related penalty for negligence.

---

[37](...continued)
is applicable.  * * *

We disagree with all of petitioners' assertions as to the accuracy-related penalties determined by respondent under section 6662(a) and (b)(1). Section 6662(a) and (b)(1) imposes a 20-percent accuracy-related penalty on the portion of an underpayment that is due to negligence or intentional disregard of rules or regulations. Negligence includes a failure to attempt reasonably to comply with the Code. See sec. 6662(c). Disregard includes a careless, reckless, or intentional disregard. See id. An underpayment is not attributable to negligence or disregard to the extent that the taxpayer shows that the underpayment is due to the taxpayer's reasonable cause and good faith. See secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs.

Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. See United States v. Boyle, 469 U.S. 241 (1985); see also Hatfried, Inc. v. Commissioner, 162 F.2d 628, 635 (3d Cir. 1947); Girard Inv. Co. v. Commissioner, 122 F.2d 843, 848 (3d Cir. 1941); Estate of Young v. Commissioner, 110 T.C. 297, 317 (1998). The good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. See United States v. Boyle, supra; sec. 1.6664-4(b), Income Tax Regs.; see also Hatfried, Inc. v. Commissioner, supra at 635; Girard Inv. Co. v. Commissioner, supra at 848;

Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991). Whether a taxpayer relies on advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and circumstances. See sec. 1.6664-4(c)(i), Income Tax Regs. A professional may render advice that may be relied upon reasonably when he or she arrives at that advice independently, taking into account, among other things, the taxpayer's purposes for entering into the underlying transaction. See sec. 1.6664-4(c)(i), Income Tax Regs.; see also Leonhart v. Commissioner, 414 F.2d 749 (4th Cir. 1969), affg. T.C. Memo. 1968-98. Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about. See Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. in part without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-93 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Reliance also is unreasonable when the taxpayer knew, or should have known, that the adviser lacked the requisite expertise to opine on the tax

treatment of the disputed item.  See sec. 1.6664-4(c), Income Tax Regs.

In sum, for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test:  (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  See Ellwest Stereo Theatres, Inc. v. Commissioner, T.C. Memo. 1995-610; see also Rule 142(a); Welch v. Helvering, 290 U.S. at 115.  We are unable to conclude that any of petitioners has met any of these requirements.  First, none of petitioners has established that he, she, or it received advice from a competent professional who had sufficient expertise to justify reliance.[38] The "professional" to whom petitioners refer is their insurance agent, Mr. Cohen.  Mr. Cohen is not a tax professional, nor do we find that he ever represented himself as such.  Petitioners' mere reliance on Mr. Cohen was unreasonable, given the primary fact that he was known by most of them to be involved intimately with

---

[38] We note at the start that we heard no testimony from Dr. McManus or Lo, their respective wives, or Ms. Sobo.

and to stand to gain financially from the sale of both the subject VEBA's and the C-group product. Given the magnitude of petitioners' dollar investment in the C-group product and the favorable consequences which Mr. Cohen represented flowed therefrom, any prudent taxpayer, especially one who is as educated as the physicians at bar, would have asked a tax professional to opine on the tax consequences of the C-group product. The represented tax benefits of the C-group product were simply too good to be true. Such is especially so when we consider the fact that the physicians who testified admitted that they knew that term insurance was significantly less expensive than the premiums purportedly paid under the C-group product solely for term insurance.

Petitioners assert on brief that they also relied on tax opinion letters written by tax attorneys and accountants. We do not find that such was the case. The record contains neither a credible statement by one or more of the individual petitioners to the effect that he or she saw and relied on a tax opinion letter, nor a tax opinion letter written by a competent, independent tax professional. In fact, petitioners have not even proposed a finding of fact that would support a finding that such a tax opinion letter exists, let alone that any of them ever read

or relied on one.  See Rule 143(b) (statements on brief are not evidence).[39]

We also are unpersuaded by petitioners' assertion that they relied reasonably on the correctness of the contents of their returns simply because their returns were prepared by certified public accountants.  The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein.  In this regard, the record contains no evidence that, possibly with the exception of Dr. Hirshkowitz, any of petitioners asked a competent accountant to opine on the legitimacy of his, her, or its treatment for the contributions, or that an accountant in fact did opine on that topic.  In the case of Dr. Hirshkowitz, the record does reveal that he showed his accountant something on the SC VEBA and that the accountant expressed some reservations as to the advertised tax treatment of the SC VEBA, but no reservations which Dr. Hirshkowitz considered "major", as he put it.  The record does not reveal what exactly Dr. Hirshkowitz showed his accountant as to the SC VEBA or the particular reservations which the accountant expressed.  Nor do we know whether a reasonable person would consider those reservations to

---

[39] Because petitioners have failed the first prong of the three-prong test set forth above, we do not set forth a copious discussion of our holdings as to the other two prongs.  Suffice it to say that none of petitioners has met his, her, or its burden of proof as to those prongs.

be "major" from the point of view of accepting Mr. Cohen's representations of the tax consequences which flowed from the SC VEBA.

We also are not persuaded by petitioners' assertion that the accuracy-related penalties are inapplicable because, they claim, the issues at bar are matters of first impression. It is not new in the arena of tax law that individual shareholders have tried surreptitiously to withdraw money from their closely held corporations to avoid paying taxes on those withdrawals. The fact that the physicians at bar have attempted to do so in the setting of a speciously designed life insurance product does not negate the fact that the underlying tax principles involved in this case are well settled. Nor does the application of the negligence accuracy-related penalty turn on the fact that this case is a "test case" as to the tax consequences flowing from a taxpayer's participation in the subject VEBA's. When the requirements for the negligence accuracy-related penalty are met, a taxpayer in a test case is just as negligent as the taxpayers who have agreed to be bound by the resolution of the test case.

We conclude that each of petitioners is liable for the accuracy-related penalties determined by respondent.

8.  Addition to Tax for Failure To File Timely

Lakewood filed its 1992 tax return with the Commissioner on May 28, 1993. The unextended due date of the return was March

15, 1993, and Lakewood neither requested nor received an extension from that date. Respondent determined that Lakewood's untimely filing made it liable for an addition to tax under section 6651(a) equal to 15 percent of the underpayment, and Lakewood has not shown reasonable cause for its untimely filing. We sustain respondent's determination and hold that Lakewood is liable under section 6651(a) for an addition to tax of 5 percent for each month during which its failure continued, or, in other words, a 15-percent addition to tax as determined by respondent. See sec. 6651(a)(1); see also Rule 142(a).

9. Penalties Under Section 6673(a)(1)(B)

Respondent moves the Court under section 6673(a)(1)(B) to impose a $25,000 penalty against each petitioner, asserting that petitioners' positions in this proceeding are frivolous and groundless. Respondent asserts that the C-group product is a "deceptive subterfuge" that was "designed to deceive on its face". Respondent asserts that petitioners have not proven the critical allegations set forth in their petitions as to the operation of the C-group product and that, at trial, petitioners, through their counsel, Mr. Prupis and Kevin Smith (Mr. Smith), contested unreasonably the admissibility of documents that respondent obtained from third parties as to the workings of the C-group product. Respondent asserts that petitioners, through Messrs. Prupis and Smith, failed to comply fully with discovery

requests, "forcing respondent to attempt to obtain the vast majority of the documentary evidence in this case from third parties". Respondent asserts that petitioners were unreasonable by calling witnesses at trial to testify in support of petitioners' proposed findings of fact that the C-group term policy's only benefit is current life insurance protection. Respondent asserts that it was unreasonable for Mr. Smith to defend against (1) respondent's motion to compel documents from AEGON USA, Mr. Smith's client, and (2) respondent's offer of evidence as to certain marketing materials and other evidence.

Petitioners argue that their positions are meritorious. Petitioners assert that respondent's motion to impose sanctions against each of them is frivolous and that the Court should sanction respondent's counsel under section 6673(b)(2).

We disagree with respondent's assertion that we should order each petitioner to pay a penalty to the Government under section 6673(a)(1)(B).[40] Section 6673(a)(1)(B) provides this Court with the discretion to award to the Government a penalty of up to $25,000 when a taxpayer takes a frivolous or groundless position in this Court. The penalty under section 6673(a)(1)(B) is imposed against each taxpayer, see sec. 6673(a)(1), and a taxpayer's position is frivolous or groundless if it is contrary

---

[40] We also decline petitioners' invitation to sanction respondent's counsel.

to established law and unsupported by a reasoned, colorable argument for change in the law, see <u>Coleman v. Commissioner</u>, 791 F.2d 68, 71 (7th Cir. 1986). Section 6673(a)(2)(B) provides this Court with the discretion to sanction respondent's counsel if he or she "unreasonably and vexatiously" multiples any proceedings before us.

The mere fact that petitioners are defending the position that was advertised to them in connection with their investment in the subject VEBA's is insufficient grounds to penalize each petitioner under the facts herein. Petitioners are not directly responsible for most of the actions listed by respondent in support of his motion to impose penalties. Those actions are best traced to petitioners' counsel, and, given the facts of this case, we decline to impute the actions of petitioners' counsel to petitioners themselves for the purposes of imposing a penalty under section 6673(a)(1)(B). Petitioners have reasonably relied on the advice of their trial counsel that their litigating positions had merit. See <u>Murphy v. Commissioner</u>, T.C. Memo. 1995-76 (section 6673 penalty against taxpayer was inappropriate where serious failure to present credible evidence at trial was attributable to her counsel).

We conclude our report directing the parties to prepare computations under Rule 155 in all but one of the docketed cases, taking into account the cost of term life insurance for those

employees who were eligible to receive that protection.  In reaching our holdings we have considered all of petitioners' arguments for contrary holdings; those arguments not discussed herein are irrelevant or without merit.  We also have considered respondent's arguments as to his determinations to the extent necessary to reject or sustain each determination.  We also have considered all of respondent's arguments as to his motion to impose a penalty against each petitioner.

As mentioned <u>supra</u>,

<u>Decision will be entered for respondent in docket No. 4572-97, decisions will be entered under Rule 155 in all other dockets, and an appropriate order will be issued denying respondent's motion to impose penalties under section 6673(a)(1)(B)</u>.