T.C. Summary Opinion 2012-100

UNITED STATES TAX COURT

RICHARD LEWIS KAUFMAN AND SARAH LYNN KAUFMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6232-11S.                    Filed October 16, 2012.

Richard Lewis Kaufman and Sarah Lynn Kaufman, pro sese.

<u>Amy B. Ulmer</u>, for respondent.

SUMMARY OPINION

GERBER, <u>Judge</u>:  This case was heard pursuant to the provisions of section

7463 of the Internal Revenue Code in effect when the petition was filed.[1]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies in petitioners' 2007 and 2008 Federal income tax of $7,103.75 and $4,359, respectively. In addition, respondent determined section 6662(a) accuracy-related penalties for 2007 and 2008 of $1,420.75 and $871.80, respectively. The issues for our consideration are: (1) whether the statutory notice of deficiency, as it concerns 2008, is valid; (2) whether during 2007 and 2008 petitioners were in the business of investing in and/or developing real estate; (3) whether petitioners have substantiated certain expenses connected with that activity; and (4) whether petitioners are liable for the accuracy-related penalties.

<u>Background</u>

Petitioners resided in the State of Oregon at the time their petition was filed. Richard Lewis Kaufman (petitioner), after graduation from the Sloan School of Management at the Massachusetts Institute of Technology and the Harvard Graduate School of Business Administration, was employed by a New York management consulting firm. In that position petitioner provided management consulting services to the top management of large corporations. Petitioner worked for a large government contractor until 1974, when he became vice president of

finance for a publicly held military contractor, followed by the position of president and general manager of a large corporation with 6,000 employees during the period 1975 through 1980. After a 20-year career petitioner retired in 1980 at the age of 46.

Beginning in 1987 petitioner purchased seven homes, the first of which was in Portland, Oregon. Sarah Lynn Kaufman (petitioner wife) was a real estate broker in Portland, Oregon. During 1987 petitioner wife became acquainted with petitioner by selling him his first home in West Linn, Oregon, a suburb of Portland. Petitioner wife's brokerage business was eventually taken over by Coldwell Banker. During 1991 petitioners decided to move to the San Juan Islands, between the United States and Vancouver, B.C. They purchased, for $140,000, two acres of undeveloped property on Shaw Island, which had approximately 100 residents. Petitioners designed a 2,500-square-foot home and served as general contractors for its construction. The home was completed in two years at a cost of approximately $310,000. As the home was on the water, petitioners decided to build a boat dock which they had designed. Obtaining a permit for the dock cost an additional $110,000 in legal expenses, making the overall cost of the home approximately $500,000.

After living in the Shaw Island home for five or six years, petitioners sold it for $1,250,000 and moved to the island of Oahu in Hawaii. They decided to build a unique home, the style of which they considered to be "tropical Asian". They purchased, for $265,000, a steeply sloped lot overlooking Waimea Bay on the north coast of Oahu. Because of the steep grade of the lot and the nature of the soil, building the home foundation was a challenge. Being unlicensed in Hawaii, petitioners hired licensed home designers to assist them in designing and building the home. Petitioner, along with an engineer, designed a unique retaining wall that solved the slope and soil issues. It was accomplished by integrating the unique concept of using the weight of the swimming pool to assist in the structural integrity and support of the dwelling on the steep grade above. Petitioners' Hawaii home had 3,600 square feet of living space. The building and the land together cost $900,000.

During 2005 petitioners sold their Hawaii home for $2.1 million. To this point, petitioners did not consider themselves to be in a business in connection with the development and sale of various homes. They then began to consider the building of homes for speculation in Hawaii or Oregon and, for various reasons, abandoned the idea as it related to Hawaii. Their plan included the idea of building

"a northwest lodge-style home". When they arrived in Bend, Oregon, they discovered that exact style home already in existence, and they purchased it during 2005 (Bend home). The Bend home was on the eastern edge of the Tetherow Resort with views of Broken Top and Mount Bachelor in the Cascade Range.

During 2007 after researching various sites petitioners purchased for $484,000 a 0.8-acre lot in the Brasada Ranch subdivision (Brasada property). The Brasada property was approximately 20 miles from Bend, Oregon, in an area called Powell Butte. Petitioners made the purchase without financing. It was their intent to use the unencumbered land as equity for future construction financing. When they purchased the Brasada property, petitioners' sole sources of income were annuities and interest on investments. Petitioner attended "designer architect seminars" that were held at Brasada Ranch for individuals who intended to build in the development.

Petitioners consulted with the architect who had designed their Bend home and discussed house style, site usage, and other matters related to lot potential. Petitioners then sought a general contractor and bank financing for construction on the Brasada property. But during the period of their search late in 2007 the market for construction loans dried up in the aftermath of the so-called subprime crisis. The prospects for building on the Brasada property continued to worsen throughout 2008

and into 2009. During that period petitioners continued to look for suitable properties, but for various reasons none were found and/or purchased.

In connection with petitioners' Bend home, a developer named Cascade Highlands, LLC (Cascade), was seeking to develop a destination resort on approximately 800 acres immediately to the west of the community in which petitioners' Bend home was located. The resort was to be named "Tetherow", and Cascade, as part of its compliance with State requirements for such a development, was planning to commit $24 million for a golf course, overnight facilities, and related amenities. Cascade intended to build on approximately 400 to 500 residential lots. The permitting and approval process for such a development was complex and multistaged, working toward a master plan.

One of the requirements of the master plan was for the developer to provide photogrammetry, aerial wide-angle photographry showing the entire development and the important or significant natural features on the development. Of note, a 1990 fire had burned 90% of Cascade's 800-acre parcel, leaving approximately 2,600 trees at the eastern end of the parcel adjacent to petitioners' residence. Petitioners' residence had a view of snowcapped Cascade mountains, which would not be obstructed by Cascade's development of the 800 acres.

Petitioners, who were seeking an easement that would distance their property from Cascade's development, objected and appealed with respect to the adequacy of the photogrammetry Cascade provided, which used images that had been taken in 2000, five years before their 2005 application for a master plan. Petitioners contended that the resolution was insufficient to tell where the trees were, and they were asking for another flyover and photograph with current and better resolution so that they could identify small trees in early stages of regrowth.

Cascade's successor in interest, Arrowood Development, LLC (Arrowood), accused petitioners of engaging in extortion and delaying the development process for the purpose of seeking or receiving a private benefit. Arrowood advised that it would seek damages, alleging that it had incurred $1.2 million in actual damages and that petitioners had interfered with its right to contract. In response, petitioners pointed out the inadequacies of Arrowood's position and continued to pursue the easement.

During November 2006 Arrowood notified petitioners that it intended to file suit against them, and it did. Petitioners hired a law firm to represent them, and on January 15, 2007, through counsel, they filed a special motion under State law to dismiss the suit. Under Oregon State law a Strategic Litigation to Avoid Public Participation (SLAPP) suit can be filed by adjacent property owners to enable them

to exercise their rights in connection with the development of destination resorts. If adjacent property owners show that a developer's claims were frivolous, untrue, and/or meant to harass, then the suit is designated a SLAPP suit and a special motion to dismiss will be granted. Under the SLAPP suit, petitioners, if successful, might have been entitled to punitive damages against the developer.

The suit Arrowood filed against petitioners eventually settled, and under an agreement to take effect May 1, 2007, the developer was limited to building single-story residences on the six lots adjacent to petitioners' Bend home. Petitioners paid approximately $29,000 in legal expenses to counsel for representation, including fees for filing their SLAPP motion and entering into a settlement agreement.

With their 2007 joint Form 1040, U.S. Individual Income Tax Return, petitioners included a Schedule C, Profit or Loss From Business. Petitioners listed the business activity as "Residential Real Est. Investment & Construction". On the Schedule C they reported $35,710.81 of interest income from their certificates of deposit as the only source of income. Various expenses totaling $31,007.77 were also claimed, resulting in a $4,703.14 net profit. Petitioners, however, did not report any income from their real estate activity on the Schedule C. The $31,007.77

of expenses included nearly $8,500 of the approximately $29,000 expended during 2007 for their legal expenses. The remaining portion of the $29,000 of legal expenses was claimed on petitioners' Schedule A, Itemized Deductions, as an itemized deduction. Petitioners based the allocation of the $29,000 in legal expenses on the percentage of their assets that was invested in certificates of deposit (approximately $1 million) and their cost of the Brasada property, $484,000, which resulted in a one-third/two-thirds allocation. Petitioners' only sources of income during 2007 were interest on certificates of deposit, pensions and annuities, and Social Security benefits.

Petitioners timely filed their 2008 Form 1040. Thereafter, petitioners filed Form 1040X, Amended U.S. Individual Income Tax Return, for 2008. The Internal Revenue Service (IRS) in turn prepared and mailed to petitioners a Form 1040X (respondent's Form 1040X) which had amounts in various spaces that were different from amounts on the Form 1040X. Respondent's Form 1040X was marked "Corrected". The differences between petitioners' and respondent's approaches to Form 1040X concerned how the amounts petitioners reported were categorized. Petitioners, in turn, crossed out certain of the amounts on respondent's Form 1040X, changed the word "Corrected" to "Revised" and resubmitted it to the

IRS with a lengthy handwritten explanation. Ultimately, the IRS issued a $838.22 refund to petitioners, an amount different from the amount petitioners had claimed. The exchange between petitioners and respondent with respect to the 2008 Form 1040X was not pursuant to an examination or audit and was computational.

Petitioners were notified during November 2009 that their 2007 Federal income tax return had been selected for examination. Following a January 2010 meeting with the examiner, petitioners were issued a May 3, 2010, examination report for both 2007 and 2008 reflecting essentially the same adjustments for both years regarding their reporting of items on Schedules C. Also on May 3, 2010, respondent issued to petitioners notification that their 2008 Federal income tax return was under examination. In a May 10, 2010, letter to respondent, petitioners requested an Appeals review for their 2007 and 2008 tax years. In a May 17, 2010, letter petitioners complained that the proposed disallowance of deductions for 2008 was without any factual foundation.

After petitioners had been contacted by Appeals, they received an October 6, 2010, request to extend the period of limitations for assessment for the 2007 tax year. The parties were unable to reach agreement about the extension of the assessment period, and on December 29, 2010, respondent issued a notice of deficiency determining that petitioners were not engaged in a trade or business and

disallowing all of the expense deductions petitioners had claimed on their Schedules C for 2007 and 2008. In addition, respondent disallowed $20,565.38 of legal expenses claimed as an itemized deduction on petitioners' 2007 Schedule A. Finally, respondent determined that petitioners' interest income for 2007 and 2008 was personal and not business income.

## Discussion[2]

Initially, we address petitioners' procedural/jurisdictional argument concerning the validity of the notice of deficiency. Petitioners contend that the notice of deficiency, as it concerns the 2008 tax year, is invalid because it was issued without an examination and/or is "incomplete, inaccurate and misleading". Petitioners rely upon the fact that respondent's notification to them that their 2008 return was under examination for 2008 was issued on the same day as the examination report for the 2007 and 2008 years. Petitioners also contend that respondent based the 2008 determination on the 2007 examination.

This Court acquires jurisdiction under section 6214 where a valid notice of deficiency is issued and a timely petition is filed. Section 6212(a) authorizes the Commissioner to send a notice of deficiency only if it is determined that there is a

---

[2]No question has been raised about who bears the burden or proof or production. Petitioners bear the burden of showing their entitlement to the claimed deductions. See Rule 142.

deficiency. "The notice must, however, 'meet certain substantial requirements.'

<u>Abrams</u>, 787 F.2d at 941. 'The notice must at a minimum indicate that the IRS has

determined the amount of the deficiency.' <u>Benzvi</u>, 787 F.2d at 1542." <u>Scar v.</u>

<u>Commissioner</u>, 814 F.2d 1363, 1367 (9th Cir. 1987), <u>rev'g</u> 81 T.C. 855 (1983); <u>see</u>

<u>also</u> <u>Clapp v. Commissioner</u>, 875 F.2d 1396 (9th Cir. 1989).

The notice sent to petitioners is clear and unambiguous, reflecting in adequate

detail the items upon which the determined deficiencies were based. The fact that

the timing of the examination notification was somewhat out of sync is of no

consequence because notification occurred before the issuance of the notice of

deficiency. Further, the fact that respondent's review of the 2008 return was more

cursory than the examination of the 2007 return is of no particular import because

the determinations and underlying adjustments for both years, except for the

amounts, are the same or similar. Accordingly, the notice of deficiency is valid, and

we have jurisdiction to consider the underlying merits of the controversy.

The core of the underlying controversy is whether petitioners were in a trade

or business and therefore entitled to deduct expenses[3] connected with their real

---

[3]Petitioners reported no income from their real estate activity. Although petitioners characterized their interest income as business income on their Schedule C, we find that to be nothing more than their attempt to make it appear that they had business income. In reality, the interest was solely a return on

(continued...)

estate activity. If we decide that they were in a trade or business, we must consider whether petitioners' expenses have been substantiated and were ordinary and necessary expenses of the activity. Irrespective of whether petitioners were in a trade or business, we must also decide whether for 2007 petitioners are entitled to deduct any portion of the legal expenses incurred in defending the lawsuit Arrowood filed against them. Finally, we must decide whether petitioners are liable for the accuracy-related penalty for 2007 and/or 2008.

Section 162(a) allows deductions for ordinary and necessary business expenses. Deductible business expenses are those incurred in an activity, trade, or business conducted with continuity and regularity and with the purpose of making a profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

Petitioner retired at a relatively young age, and petitioners became interested in the design, construction, situs, etc. of their personal residences. Their pursuit of these interests became an avocation, and they acquired experience in various aspects of home design and construction. They focused upon certain macroscopic aspects of home design, such as Asian architecture, site issues, and home size. Throughout their retirement years, petitioners spent a considerable

---

[3](...continued)
investment in certificates of deposit and in no manner related to a business activity.

amount of time involved in these matters, but they did not consider their activity to be a business until they purchased the Brasada property for $484,000.

Petitioners spent considerable time and effort analyzing the location and other aspects of the Brasada property before they purchased it. It was their intention to build a uniquely situated and designed home on the lot and to sell it for a profit. When it came time to seek out financing for this project, petitioners encountered difficulty in obtaining financing because the housing market had collapsed and property values were in a downward spiral. As of the time of trial petitioners had not done anything further with the Brasada property because of economic conditions.

During 2007 and 2008 petitioners were engaged in planning for the development of their Brasada property and building a home on it. During these years petitioners acquired and were holding a capital asset--the Brasada property. Petitioners were not actively attempting to sell the Brasada real property, nor did they acquire other real property for sale. Their only source of income was interest on certificates of deposit and annuities. There is no doubt that petitioners intended to profit from the purchase of the Brasada property, but their activity had not, as of 2007 and 2008, become a trade or business conducted with continuity and regularity. Their expenditures in connection with the acquisition and planning of the

Brasada property were in the nature of capital expenditures and are not deductible for the years in issue. We accordingly hold that petitioners are not entitled to the claimed Schedule C deductions for 2007 or 2008.[4]

Although we have held that petitioners' activity was not a business, we must consider whether any portion of the legal expenses incurred in defending the Arrowood suit is deductible as an itemized deduction. Petitioners claimed a business expense deduction for a portion of their legal expenses and an itemized deduction for the other portion. Generally, if legal expenses are personal, they are not deductible. Secs. 212, 262(a). "Ordinary and necessary expenses paid or incurred in connection with the management, conservation, or maintenance of property held for use as a residence by the taxpayer are not deductible." Sec. 1.212-1(h), Income Tax Regs. It has long been held that the deductibility of legal expenses depends upon the origin of the claim for which the expenses were incurred. United States v. Gilmore, 372 U.S. 39, 49 (1963).

Petitioners' allocation of the legal expenses implies that they are making two different arguments regarding them: first, that a portion of the legal expenses was incurred for the purpose of conserving and maintaining their residential property

---

[4]Because of our holding that they are not deductible, there is no need to decide whether petitioners have substantiated the claimed expenses.

and, second, that the other portion was incurred to protect their business reputation from libelous allegations by Arrowood. Petitioners rely on caselaw where courts permitted the deduction of legal fees to protect professional or business reputation. See, e.g., Commissioner v. Heininger, 320 U.S. 467 (1943); Dyer v. Commissioner, 36 T.C. 456 (1961).

First, we note that the cases petitioners rely upon predate the most current preeminent Supreme Court case on the subject. See Gilmore, 372 U.S. 39. In Gilmore the taxpayer incurred legal expenses in defending a divorce proceeding, and he contended that he was attempting to conserve and protect his income (salary), which was the source of alimony or support that could have been mandated in the divorce decree. The Supreme Court in Gilmore considered the origin and character of the taxpayer's claim rather that its potential consequences. Id. at 44-51. The Court found that the wife's divorce claim stemmed from the marital relationship and not from the husband's income-producing activity. Id. at 51-52.

Likewise, here the origin of petitioners' obligation to pay legal expenses was their seeking an easement in connection with their residence. Clearly, petitioners did not defend Arrowood's suit to protect their income-producing activity. At the time of the suit, petitioners' sole source of income was pensions and passive

investments in capital assets (certificates of deposit). Petitioners have tried, mightily, to make it appear that their interest income was actually business income. By no stretch of the imagination could we interpret the record in this case to find that petitioners had business income.

As to petitioners' claim that they were defending the Arrowood litigation in order to protect their business reputation, our reading of the pleadings and correspondence does not lead us to the conclusion that petitioners' business reputation was being impugned. We hasten to add that petitioners did not appear to have a business reputation, as their only possible business-related activity through 2008 was the purchase and planning of a building lot. On the facts of this case we hold that petitioners are not entitled to deduct any portion of the legal expenses incurred to defend the Arrowood suit.

Finally, we consider whether petitioners are liable for the accuracy-related penalty for 2007 and/or 2008. Section 6662(a) and (b)(1) and (2) provides for a 20% penalty on an underpayment of tax due to negligence or disregard of rules or regulations or a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). The 2007 understatement exceeds 10%

of the tax required to be shown on the return and $5,000 and is therefore a substantial understatement.

Therefore for 2007 the accuracy-related penalty under section 6662 would apply unless petitioners demonstrate under section 6664(a) that the underpayment was due to reasonable cause and that they acted in good faith. Neonatology Assocs., P.A. v. Commissioner, 299 F.3d 221 (3d Cir. 2002), aff'g 115 T.C. 43 (2000). In addition, respondent determined that petitioners were negligent and had disregarded rules or regulations for both 2007 and 2008.

Petitioners attempted to portray their purchase of a building lot as a business activity. They went to great lengths to make it appear on their returns that they were engaged in a business activity, including the portrayal of passive interest income as business income. Petitioners' attempts to make it appear that they were in a business makes clear their understanding that they were not. It also indicates that they were aware of the elements that are used to judge such activity. We find their approach to reporting their income to be negligent and not reasonable and so hold.

In these circumstances petitioners did not have reasonable cause and they did not act in good faith. Accordingly, respondent's determination of accuracy-related penalties for 2007 and 2008 is sustained.

To reflect the foregoing,

Decision will be entered

for respondent.